**UNITED STATES**
v.
**Aldo Lorenzo ICARDI.**
Crim. No. 821–55.

United States District Court
District of Columbia.
April 19, 1956.

384

Oliver Gasch, U. S. Atty. for the District of Columbia, Victor C. Woerheide, Kevin Maroney, Marvin Segal, Attys., Dept. of Justice, Washington, D. C., for U. S.

Edward Bennett Williams, Murdaugh Stuart Madden, Agnes A. Neill, Washington, D. C., for defendant.

KEECH, District Judge.

This court now has for determination whether the Government has proved that the questions which the indictment charges the defendant Icardi answered falsely were asked by "a competent tribunal" and whether his answers related to a "material matter." These two facts are essential elements of the offense with which the defendant is here charged. Hence, although matters of law for determination by the court, they must be proved by the Government like any other essential element of the crime; and the court must grant defendant's motion to dismiss unless it finds the Government has proved them beyond a reasonable doubt.

At the outset, the court is faced with two basic principles of law: the presumption of the validity of governmental proceedings, and the presumption that the accused is innocent. Since the second presumption outweighs the first, the presumption of validity must be supported by proof of the validity of the legislative proceedings and materiality of the specific answers which defendant is alleged to have falsely given. Sinclair v. United States, 279 U.S. 263, 296, 49 S.Ct. 268, 73 L.Ed. 692.

Considering in turn the questions of competency of the tribunal and materiality of the questions asked and an-

swers thereto, what is the government's proof on each issue?

 Under H.Res. 5, 83rd Congress, Rule XI, Sec. 3, the Committee on Armed Services was given jurisdiction of "(a) The common defense generally," and "(b) The Department of Defense generally, including the Departments of the Army, Navy, and Air Force generally," as well as other matters not here pertinent. Under this broad authority, as supplemented by H.Res. 125, 83rd Congress, the Committee on Armed Services or a subcommittee thereof could legitimately investigate whether existing law adequately covered crimes against persons or property committed overseas by members of our armed forces, and whether the Defense Department was being efficiently administered, and to that end to compel testimony under oath.

 The fact that legislation touching on the general subject had already been enacted would not estop further investigation as to its adequacy or investigation as to the efficiency of the administration of the military establishment.

 Any conclusion which the committee or a subcommittee might reach on these questions would necessarily be founded upon an investigation of the facts of specific cases. The Chairman of the Armed Services Committee therefore had authority to appoint a special subcommittee to investigate a particular alleged offense, a segment of the whole picture, as an initial step toward reaching a valid legislative judgment.

The special subcommittee described in the indictment was appointed during the 83rd Congress by the Chairman of the Armed Services Committee by letter of March 11, 1953, addressed to Congressmen Cole and Kilday (Govt. Exhibit 9), the pertinent portions of which read:

"* * * I constitute you a Subcommittee to investigate the circumstances surrounding the disappearance and death of Maj. William V. Hollahan (sic), while a member of the Armed Forces on assignment to the Office of Strategic Services in the Italian Campaign of 1944 * * *. You are authorized to take such further action in the matter as, in your opinion, the facts and legislative interest may require; and, if you shall be so advised, to render such report on your further investigation and studies as will, in your opinion, be useful and informative to the Congress."

This subcommittee, as shown by the letter and testimony before the court, was appointed to continue the work of an 82nd Congress subcommittee appointed for the same purpose, of which Congressmen Cole and Kilday had been members. The predecessor committee had conducted hearings on December 19, 1951, and January 9 and 10, 1952, at which, according to the transcript of proceedings, the oral testimony received was that of Michael Stern, an employee of Fawcett Publications and foreign correspondent of True magazine, and Henry L. Manfredi, a Treasury Department employee formerly connected with the Army as a Chief Agent of the Criminal Investigation Division. The subcommittee had also received statements of certain persons in Italy and of another member of Major Holohan's OSS team, Carl LoDolce, which fixed responsibility for Major Holohan's death on Icardi and upon which the hearsay testimony of Stern and Manfredi was apparently based in large part. As to the three alleged eye-witnesses to what occurred at the Villa Castelnuovo on the night of December 6, 1944, each of them could have had good reason to cast responsibility for a brutal murder on some one other than himself, and the Italian affidavits were all obtained in a political climate such as the United States has never known. The committee also had other information from the files of the OSS and CID, including Icardi's own statements during the investigation by military authorities of Major Holohan's disappearance, as well as Icardi's statements before the Pennsylvania Board of

Law Examiners, on the radio, and before other organizations with respect to the charges against him.

No further hearings were held by the subcommittee between January 10, 1952, and March 26, 1953. Congressman Cole testified before this court that the delay was because the committee was awaiting the outcome of other proceedings, namely, proceedings looking toward prosecution in Italy of Icardi and LoDolce.

On March 19, 1953, the subcommittee addressed a letter to Icardi reading in part:

"The subcommittee desires to have from you any evidence—competent, relevant, or material—relating to this subject [the circumstances surrounding the death, on or about December 6, 1944, of Maj. William V. Holohan, AUS] which you may have and may desire to offer. Your evidence * * * will be received by the subcommittee on Thursday, March 26, 1953, at 2 o'clock in the afternoon, in the Armed Services Committee room, No. 313, Old House Office Building, Washington, D. C.

"If you do not appear, the subcommittee must assume that it is in possession of all evidence required to form its opinion and report, for the information of the Congress."

On March 26, 1953, Icardi appeared pursuant to the letter. Before Icardi was questioned, the chairman of the subcommittee warned him that anything he said might be used against him in a "future proceeding or tribunal." The subcommittee counsel informed Icardi that the subcommittee was in possession of transcripts of his prior statements in connection with the matter.

Despite the warning, Icardi freely answered the questions put to him, substantially reiterating his former statements concerning the disappearance of Major Holohan. Icardi was the only witness questioned at this hearing.

Thereafter, on May 19, 1953, the subcommittee heard the final witness, Col. Ralph W. Pierce, former Chief, Criminal Branch, Provost Marshal's Office, who had conducted a polygraph or "lie-detector" test of Icardi in 1947. His testimony concerned the conducting of the test, which was for the purpose of ascertaining whether Icardi had any knowledge of Major Holohan's disappearance, and as the result of which Colonel Pierce, according to his recollection, had concluded that Icardi did not kill Holohan and probably did not know who did, although he could not give a conclusive opinion on the basis of the tests made.

Under date of July 16, 1953, the special subcommittee rendered its report, which was approved and adopted by the full Committee on Armed Services July 24, 1953. (Government Exhibit 10.)

As counsel for the government has very properly pointed out to the court, the legislative purpose of the subcommittee's investigation must be gleaned from the evidence before the court, namely, the documents introduced in evidence, the resolutions relating to its appointment and powers, the transcript of the hearings held by it, the subcommittee's letter to Icardi, the report of the subcommittee, and the testimony at this trial of the Chairman of the Armed Services Committee and the chairman of the special subcommittee.

Buttressed by the presumption of validity, the evidence warrants a finding that the special subcommittee was validly constituted by the Chairman of the Armed Services Committee, and that the subject matter confided to the subcommittee for investigation was relevant to a twofold valid legislative purpose, namely, inquiry as to (1) whether existing laws were adequate to provide for prosecution of crimes committed by former service personnel while serving overseas, and (2) whether the Department of Defense was functioning efficiently. The interpretation which the subcommittee placed upon its authority and the purpose for which the hearings were actually conducted, particularly the

hearing at which the defendant Icardi testified, present a different and more difficult question.

The transcript of testimony indicates that, at the outset, the inquiry was directed primarily to the issue of the guilt or innocence of Icardi and the other members or aides of the OSS team of the murder of Major Holohan and the robbery of his body, Icardi's alleged embezzlement of government funds, and incidentally the investigation which had been made thereof. As heretofore stated, the only witnesses who testified before the subcommittee were Stern, Manfredi, Icardi, and Colonel Pierce. The affidavits of LoDolce and the persons in Italy complete the transcript of the hearings before the subcommittee. The only real testimony with respect to the conduct of the military investigation into Major Holohan's disappearance came from Manfredi, no longer connected with the Defense Department, and from Colonel Pierce. It is significant to the court, on the issue of the legislative purpose of the subcommittee's investigation, that no other witnesses were interrogated as to the Defense Department's conduct of its investigation before or after the discovery of the Major's body or the steps the Department had taken to press charges after its investigation.

Turning to the report of the special subcommittee, it states in terms:

> "The inquiry by the special subcommittee was concerned, *primarily* with whether or not a crime had been committed; whether prosecution was possible; in what jurisdiction it would lie—whether military, civilian, or Italian authority; and whether the Federal statutes were inadequate in any respect or had been improperly administered by the Army."

There follows a Statement of Facts, approximately four pages of which state *as facts* the details of Icardi's animosity for Major Holohan, Icardi's threats against the Major, the murder of Major Holohan by Icardi and LoDolce, and their concealment of the crime, as well as Icardi's embezzlement of government funds, all as related in the hearsay evidence before the subcommittee. The remainder of this statement of facts, which deals with investigations of the disappearance, proceedings against Icardi and LoDolce, and publicity in the press, and summarizes the testimony before the committee, both oral and documentary, is in the nature of a valid committee report on a subject within its jurisdiction, although statements in this portion are tainted by the subcommittee's own prior adjudication of Icardi's guilt. For example, the report (p. 11) states "at the time of this hearing [before the Allegheny County Board of Law Examiners], Icardi related the *false* version concerning Holohan's disappearance," and again (p. 12), referring to Icardi's testimony before the subcommittee, "His story in part was identical to the one given by witnesses in Italy and the United States except for the *true facts* concerning Holohan's murder and disappearance."

There follows a Review of the Evidence, which refers to Icardi as "the accused" and reiterates "the emphasis in this case has always been upon the most dramatic aspect, the murder, jurisdiction as to which has been lost to Army courts martial by the severance of accused from the service." This section reviews the probabilities of convicting Icardi or LoDolce on any charge under existing law.

There is a question as to the propriety of the report's Conclusions, which state there is "probable cause" for charging Icardi and LoDolce with murder and embezzlement, but that they are not subject to prosecution under existing civil law or under the Uniform Code of Military Justice. The use of this language indicates the functioning of the subcommittee as a committing magistrate. As to the report's final Recommendations, which suggest that legislative amendments to the Federal Criminal Code be recommended to the Judiciary Committee, the court finds this portion of the subcommittee's report was an ex-

ercise of a bona fide legislative function. The validity of this latter recommendation, however, cannot cure the invalidity of the subcommittee's adjudication of crime contained in the report's Statement of Facts.

Although the subcommittee's report was made after Icardi's testimony, its contents are relevant to show that body's conception and exercise of its authority and functions.

Chairman Cole testified that the subcommittee already had in its possession sufficient information on which to base its report to the Congress, including Icardi's prior statements on many occasions, and that the purpose of asking Icardi's appearance before the subcommittee was to give him an opportunity to tell his side of the story. Chairman Cole further testified that, to the best of his recollection, before asking Icardi to testify, he discussed with his colleague and counsel for the subcommittee the calling of Icardi, putting him under oath, and the possibility of a perjury indictment as the result of Icardi's testimony. It is unnecessary for the court to determine for which purpose Icardi's testimony was sought or obtained, since neither affording an individual a forum in which to protest his innocence nor extracting testimony with a view to a perjury prosecution, is a valid legislative purpose.

■ This court does not hold that the mere fact that a committee has in its possession a prior statement of an individual is a bar to the committee's compelling his testimony on the same subject, even though it be merely cumulative, *provided* such testimony is obtained by the committee for a legislative purpose within its jurisdiction. The court does hold that if the committee is not pursuing a bona fide legislative purpose when it secures the testimony of any witness, it is not acting as a "competent tribunal", even though that very testimony be relevant to a matter which could be the subject of a valid legislative investigation.

■ While a committee or subcommittee of the Congress has the right to inquire whether there is a likelihood that a crime has been committed touching upon a field within its general jurisdiction and also to ascertain whether an executive department charged with the prosecution of such crime has acted properly, this authority cannot be extended to sanction a legislative trial and conviction of the individual toward whom the evidence points the finger of suspicion.

■ On the basis of all the evidence before it, the court therefore finds, as a matter of law, that at the time the subcommittee questioned the defendant Icardi it was not functioning as a competent tribunal.

■ Assuming, however, that the subcommittee was functioning as a competent tribunal when Icardi gave the testimony upon which the indictment is based, the court holds, as a matter of law, that the false answers defendant is charged with having given did not relate to a "material matter."

■ As stated in Fraser v. United States, 6 Cir., 145 F.2d 145, 149, certiorari denied 324 U.S. 842, 65 S.Ct. 586, 89 L.Ed. 1403, the test of materiality is whether the false testimony was capable of influencing the tribunal on the issue before it.

■ When a committee of Congress is engaged in a legitimate legislative inquiry and the questions propounded are relevant and material to that inquiry, the courts will not question the motives of the questioners. Eisler v. United States, 83 U.S.App.D.C. 315, 170 F.2d 273, 278, 279. And the fact that a crime may be disclosed by the answer does not make a question immaterial. McGrain v. Daugherty, 273 U.S. 135, 136, 47 S.Ct. 319, 71 L.Ed. 580. There are, however, limitations upon the investigative power of the legislature which must be considered in any determination of materiality. The investigation must be to aid in legislation. McGrain v. Daugherty, supra, 273 U.S. at

page 178, 47 S.Ct. 319. "Similarly, the power to investigate must not be confused with any of the powers of law enforcement; those powers are assigned under our Constitution to the Executive and the Judiciary." Quinn v. United States, 349 U.S. 155, 161, 75 S.Ct. 668, 672, 99 L.Ed. 964.

It is relevant to this issue also that when Icardi was questioned the hearings had been reconvened after a lapse of fourteen months; that before Icardi was summoned the subcommittee had all the information necessary on which to base its report, including Icardi's version of the incident; and that although it has been testified that Icardi was invited to appear in order to give him a forum in which to tell his side of the story of Major Holohan's disappearance, before that invitation was sent the chairman had discussed with his colleague and the subcommittee counsel the possibility of indicting Icardi for perjury, if under oath he should adhere to his former statements. When Icardi received the subcommittee's letter "inviting" him to testify before it, he was asked to appear on peril of the subcommittee's finding him guilty of murder, robbery, and embezzlement, if he should fail to comply.

The subcommittee must have known that if Icardi appeared before it his testimony could fall within one of three categories: (1) he could confess guilt; (2) he could stand on his constitutional privilege against self-incrimination, which would have the same effect upon the subcommittee's conclusions as if he had confessed guilt; and (3) he could repeat his denial of guilt, as given in all the previous statements in the possession of the subcommittee.

The facts sought to be elicited by the questions which are the subject of this indictment all dealt with the issue of Icardi's guilt of the crimes with which he had been charged. The court has not overlooked the Government's argument that the matters sought to be elicited by these six questions were material because, if Icardi had impressed the subcommittee with his credibility and had produced substantial corroborative evidence, the subcommittee might have concluded that he was innocent. In the face of the evidence that, as of the time he was questioned, Icardi's answers could have no effect upon the subcommittee's conclusions in the field of legitimate congressional investigation, this slim conjecture cannot support a finding by this court, as a matter of law, that Icardi's answers related to a material matter. Whether Icardi denied or confessed guilt by his answers, his testimony could not have influenced the subcommittee's conclusion on subjects which might be legitimately under investigation, namely, whether existing law adequately covered the prosecution of crimes committed under the circumstances of the specific charge under investigation, and whether the Defense Department had functioned adequately in its investigation of the Holohan disappearance.

Therefore, under the test set forth in the Fraser case, the court holds as a matter of law that the alleged false answers by Icardi were not material to the subcommittee's authorized investigation.

Counsel for the government has suggested that frequently individuals are adjudged guilty of an offense by a congressional committee in the exercise of its functions. This court doubts the accuracy of such statement; but, if it be true, such practice should not be condoned, as it denies to the accused the constitutional safeguards of judicial trial.

For the foregoing reasons the defendant's motion to dismiss—which I believe under the new rules I must treat as a motion for judgment of acquittal—must be granted.

I shall ask the Marshal to call in the jury and I shall direct a verdict of acquittal for the defendant.