UNITED STATES of America
v.
James G. CROSS.
Crim. No. 908-58.

United States District Court
District of Columbia.
Feb. 17, 1959.

Oliver Gasch, U. S. Atty. for District of Columbia, Washington, D. C., Robert S. Bailey, Philip T. White, Sp. Attys., Dept. of Justice, Washington, D. C., James W. Knapp, William G. Hundley, Attys., Dept. of Justice, Washington, D. C., for government.

Edward Bennett Williams, Agnes A. Neill, Thomas A. Wadden, Washington, D. C., for defendant.

KEECH, District Judge.

When we recessed this trial yesterday evening, I took under advisement a motion by the defendant for a judgment of acquittal on the ground that the Government has failed to prove two essential elements of the offense of perjury here charged, namely, that the Senate Select Committee on Improper Activities in the Labor or Management Field was sitting as a "competent tribunal" at the time of the alleged false testimony by the defendant and that the alleged false testimony was a "material matter", within the purview of 18 U.S.C. § 1621. Prior to the defendant's motion the Government had informed the court that it had put in all of its basic evidence on these two elements, in the form of all pertinent portions of the transcripts of the Committee hearings and its Interim Report (S.Rep. No. 1417). While counsel for the Government stated that they expected the testimony of some of their witnesses would bear upon the competence of the Select Committee at the critical time and upon the materiality of the questions put.

to defendant, they conceded that such testimony would be merely corroborative of the evidence now in the record, which the court has accepted as true in all respects.

Since the court must find, as a matter of law, that these two elements, essential to the crime of perjury under 18 U.S.C. § 1621 (United States v. Debrow, 346 U.S. 374, 376, 74 S.Ct. 113, 98 L.Ed. 92), have been proved, prior to any submission to the jury of the issue of truth or falsity of the alleged perjured testimony, the motion is an appropriate one for disposition at this stage of the trial.

The pertinent portion of S.Res. 74, 85th Congress, 1st Session, which created the Select Committee, provides:

> "*Resolved*, That there is hereby established a select committee which is authorized and directed to conduct an investigation and study of the extent to which criminal or other improper practices or activities are, or have been, engaged in in the field of labor-management relations or in groups or organizations of employees or employers to the detriment of the interests of the public, employers or employees, and to determine *whether any changes are required in the laws of the United States* in order to protect such interests against the occurrence of such practices or activities."

The defense, for the record, made the further contention that the resolution defining the scope of the Select Committee's authority is bad for vagueness in authorizing and directing an investigation and study of "other *improper* practices", a term which counsel argues is too indefinite, but defense counsel has not pressed this point.

The resolution does not detail the improper practices which the Select Committee is authorized to investigate, but the Chairman, at the opening of the Committee's first hearings in March, 1957, outlined its purpose, saying:

> "Therefore, in the coming months this committee expects to give at-

tention to problems inherent in labor-management collusion, underworld infiltration of the labor movement, misuse of union and welfare funds, suppression of civil rights and liberties of union members by their leaders, conflict of interest, and the use of violence, shakedowns, and extortions." (Printed Committee Record, Part 1, p. 2.)

At the time of initiating the investigation of the Bakery and Confectionery Workers' International Union of America, of which the defendant Cross is and has been President since 1952, the Chairman stated that the hearings would touch upon complaints of dictatorial and undemocratic practices, among other subjects touching that Union.

The Interim Report of the Select Committee, dated March 24, 1958 (S.Rep. 1417), based upon the investigations of the activities of various unions, including the Bakers' International, suggests legislation to insure union democracy.

Upon all the material which has been received in evidence, stipulated by both parties to be correct, the court finds:

(1) That S.Res. 74, creating the Select Committee, is a valid delegation of power to conduct legislative investigations and that it is not bad for vagueness;

(2) That the Select Committee was duly constituted;

(3) That a quorum was present at the time of the testimony by the defendant Cross on July 16, 1957, upon which the indictment is based; and

(4) That the scope and purpose of the Select Committee's investigation of the affairs of the Bakery and Confectionery Workers' International Union of America were within the legislative purpose of the authorizing resolution; and that the hearings could well have led to discovery of facts upon which to base proposed legislation and the enactment of remedial laws.

Under the stated purpose of S. Res. 74 and within its delegation of in-

vestigative authority to the Select Committee, no more vital inquiry could be made than to ascertain whether improper practices were being indulged in by organized labor which resulted in intimidation of union members or executives to the extent that the union was not truly representative, or so that no free democratic election of officers or amendment of the constitution could be had. Clearly, questions asked by the Select Committee for the purpose of eliciting facts concerning such alleged improper practices might influence legislation, hence were material to the legitimate legislative purpose. Fraser v. United States, 6 Cir., 145 F.2d 145, 149, certiorari denied 324 U.S. 842, 65 S.Ct. 586, 89 L.Ed. 1403. Just as clearly, when the Select Committee propounded such questions for such purpose, it was a "competent tribunal" within the purview of the federal perjury statute.

"When a committee of Congress is engaged in a legitimate legislative inquiry and the questions propounded are relevant and material to that inquiry, the courts will not question the motives of the questioners. Eisler v. United States, 83 U.S.App.D.C. 315, 170 F.2d 273, 278, 279. And the fact that a crime may be disclosed by the answer does not make a question immaterial. McGrain v. Daugherty, 273 U.S. 135, 136, 47 S.Ct. 319, 71 L.Ed. 580. There are, however, limitations upon the investigative power of the legislature which must be considered in any determination of materiality. The investigation must be to aid in legislation. McGrain v. Daugherty, supra, 273 U.S. at page 178, 47 S.Ct. 319. 'Similarly, the power to investigate must not be confused with any of the powers of law enforcement; those powers are assigned under our Constitution to the Executive and the Judiciary.' Quinn v. United States, 349 U.S. 155, 161, 75 S.Ct. 668, 672, 99 L.Ed. 964." United States v. Icardi, D.C., 140 F.Supp. 383, 388–389.

■ It has been recognized that a legislative committee, although duly authorized to investigate adequately de-fined subjects in a field where it may legislate, has no power to compel the testimony of a witness for other than a bona fide legislative purpose, even though the testimony be relevant to the subject matter of the authorized investigation. Watkins v. United States, 354 U.S. 178, 187, 77 S.Ct. 1173, 1 L.Ed.2d 1273.

■ Although the *motives* of a congressional committee are irrelevant when it interrogates a witness on matters pertaining to an investigation within the scope of its authority, the answers responsive to questions which are not asked for the *purpose* of eliciting facts in aid of legislation, even though pertinent, are not "material" to the authorized investigation; and when a duly constituted investigative committee questions a witness solely for a purpose other than to elicit facts in aid of legislation, that committee steps outside its authority and no longer acts as a competent tribunal.

■ A legitimate legislative purpose will be presumed when the general subject of investigation is one concerning which Congress can legislate and when the information sought might aid the congressional consideration (United States v. Orman, 3 Cir., 207 F.2d 148, 157, and cases there cited; Sacher v. United States, 99 U.S.App.D.C. 360, 365, 240 F.2d 46, 51); but any presumption in a criminal case may be controverted by adequate evidence to the contrary.

The narrow question presented by the motion in this case is whether, on July 16, 1957, when the defendant Cross was recalled before the Select Committee and gave the alleged false testimony upon which the indictment is based, the Committee propounded the questions to the defendant Cross for the purpose of eliciting from him facts which might aid in legislation.

The questions and answers must be viewed in their entire setting.

On June 16, 1957, Joseph G. Kane, president of a local bakers' union, testified concerning his opposition of certain amendments to the constitution of the Bakery and Confectionery Workers' In-

ternational Union, proposed by the defendant Cross and his supporters and adopted at the San Francisco convention of the Union in October, 1956, but which he and others opposed as undemocratic. The witness Kane then stated that in the early morning hours of October 21, 1956, several days prior to the convention, the defendant Cross, together with three of his supporters, assaulted him in his room at the Olympic Hotel in San Francisco; that he was forced to accompany Cross and his companions to the Fielding Hotel, where Louis Genuth, another local union officer, was beaten up; and that both Kane and Genuth were then forced to accompany Cross and his henchmen to the Clift Hotel, where Nathan Ehrlich, another local union official of the opposition, and his wife were assaulted. The witness Kane charged that the violence was for the purpose of intimidating their opposition to the proposed constitutional amendments. Kane further testified that complaints were lodged with the San Francisco police as to the alleged assaults, but that the grand jury did not indict.

On June 20, 1957, the defendant Cross, who had been interrogated at length concerning various other union matters, referred to the San Francisco "incident". (Tr., p. 3014.) Thereafter, the record reveals the following:

"Mr. Kennedy [Committee Counsel]. Were you in this room out in San Francisco where the beating of Joe Kane was supposed to have taken place?

"Mr. Cross. No, sir.

"Mr. Kennedy. You were not?

"Mr. Cross. No, sir.

"Mr. Kennedy. You know nothing about it?

"Mr. Cross. Nothing at all.

"Mr. Kennedy. His testimony to the contrary is incorrect, is that right?

"Mr. Cross. I will say the same as I voluntarily told the grand jury in San Francisco, waiving immunity

* * *. I was asleep in my room. I was not there.

* * * * * *

"The Chairman. Let me ask you a question. Did you get any report on what occurred?

"Mr. Cross. At 9 o'clock Monday morning, Bill Ring, our union label publicity director, called my room and said a reporter called him and said there had been some disturbance among some of the delegates in one of the hotels and they claimed I was involved. I told Bill to quit kidding me, that I was at a convention, and I was too busy to be bothered by jokes at this time.

"The Chairman. What I am trying to—

"Mr. Cross. I will give you the details, Senator McClellan. I got the details at 1 o'clock, Monday morning."

After questioning the defendant Cross briefly as to what procedures the Union followed in cases where the use of force and violence was charged, the Committee directed its examination of the witness to other matters.

On July 16, 1957, the next meeting of the Select Committee, Mrs. Nathan Ehrlich was called as a witness. The transcript discloses (Tr., p. 3030) the following introductory statement by the Committee counsel:

"Mr. Kennedy. Mr. Chairman, we had some testimony before the committee in a previous session by Mr. Joseph Kane, who was also present in San Francisco, that Mr. James Cross, among others, came to his room and that there was a fracas, and involved also in this fracas out in San Francisco was Mrs. Ehrlich.

"Now, Mr. Cross testified that he was in bed during this period of time and knew nothing about it until he heard about it the following morning, and so Mrs. Ehrlich is being called in order to try to clarify the record."

After Mrs. Ehrlich had testified as to the defendant Cross's assault upon her and her husband in their room at the Clift Hotel on the morning of October 21, the Committee counsel asked the further question (Tr., p. 3032):

"Mr. Kennedy. But his testimony before this committee that he was not present at that time, and he was in bed, is not true, is that right?

"Mrs. Ehrlich. I could just swear on anything that is dear to me that he was there  *  *  *."

Following Mrs. Ehrlich's testimony as to the assaults on her and her husband, the defendant Cross was recalled to the stand. The Chairman of the Committee addressed the witness (Tr., pp. 3032–3033):

"The Chairman. You have heard the testimony, I assume, of Mrs. Ehrlich who has just testified regarding your presence in her room, the room of she and her husband in the hotel in California, in San Francisco, Calif., on the date she stated.

"Did you hear her testimony?

"Mr. Cross. Yes, sir.

"The Chairman. *Is that the same occasion that you previously testified about when you were on the witness stand before this committee?*

"Mr. Cross. *Well, in regards to this matter, yes.*

"The Chairman. *In other words, the time and place that she testified to is the same time and place you testified to when you previously appeared?*

"Mr. Cross. *Yes,* except of course, that that is not the time of our convention and our convention did not open for 3 or 4 or 5 days later.

*       *       *       *       *       *

"The Chairman. You have heard her testimony that you were present in the room and you came with the others who came in some time early that morning, about a quarter to six I believe she said, and demanded entrance into the room and after which some altercations took place.

"*You testified before, positively, that that was not true, that you were in your own hotel at the time.* Now, having heard this testimony of this lady, who says she has known you for many years and that she could not be mistaken in her identity, *do you wish to further refute her testimony by further denial?*

"Mr. Cross. Not by further denial. I stand on the same testimony that I gave before.  *  *  *".

Starting with the presumption that the Committee was pursuing a valid legislative purpose when it questioned the witness on subjects relevant to matters within the scope of its investigatory authority, what does the record disclose on its face as to the Committee's purpose in recalling the witness Cross? Counsel for the government has argued that the denial in his earlier testimony related only to his presence at the alleged assault on Joseph Kane in the Olympic Hotel, and that prior to his recall Cross had not been interrogated as to the alleged assaults in the Ehrlichs' room at the Clift Hotel. Read alone, the defendant's first denial may be ambiguous. It might be interpreted as applying only to the assault on Kane, or as applying to the whole "fracas" or "incident", including the series of assaults described by Kane. The statement of the Committee counsel prefatory to Mrs. Ehrlich's testimony on July 16th and the Chairman's questioning of the defendant Cross upon his recall leave no doubt that the Committee interpreted the defendant's previous testimony as a denial that he was present at any of the alleged assaults, including whatever transpired in the Ehrlichs' room. The record further shows that the Committee's interpretation of his previous testimony was not challenged by the defendant Cross when he stood on his previous denial of any personal knowledge of the whole incident.

The Committee's intent in recalling the defendant Cross may be gleaned from the things said and done by its

chairman, counsel, and members. Before the questions were propounded to the defendant on July 16th the Committee had before it not only the directly contradictory testimony of Mr. Kane and Mrs. Ehrlich and the statements of several other witnesses as to strong-arm tactics by Cross on the occasion in question, as well as the police reports and a statement from the office of the District Attorney of San Francisco that it was "of opinion that Cross, contrary to his statement, was in the hotel room when the argument and alleged beating took place," [1] but also had heard a prior flat denial under oath by Cross that he was present at or had any direct knowledge of the alleged series of assaults on October 21, 1956.

What facts then could the Committee expect to elicit from Cross upon his recall? What legitimate legislative purpose could be served by questioning him again regarding the incident? If the witness adhered to his prior' testimony the Committee gained no additional facts. If he admitted that he was present at the time of the Ehrlich assault, it would merely corroborate the information the Committee already had in its possession. If the witness refused to answer, invoking the protection of the Fifth Amendment,[2] the Committee gained no new information—certainly none which would tend to influence legislation. Whichever course the witness should take, what aid to the legislative purpose could be hoped for by the Committee? As shown by the statements of its Counsel and Chairman, the Committee, on Cross's own prior testimony, had no doubt of his position as to the occurrences concerning which they sought to interrogate him again. The whole tenor of the examination of the witness Cross concerning the many subjects upon which the Committee had already questioned him at length, demonstrates that body had little confidence in his veracity.

If the Committee believed him there was no need to recall the witness Cross, as it did, for testimony on this one subject. If they disbelieved him, no legislative purpose was to be furthered by hearing him reiterate his prior false statement. Should the witness recant, no legislative purpose would be served, although there would be a firmer basis for a perjury indictment than was afforded by the prior denial.

█ As stated earlier, it is elementary that committees of the Congress may not usurp the functions of a committing magistrate or prosecuting attorney in the guise of legislative investigation.

█ The validity of this perjury case must be tested by the purpose of the Committee in propounding the specific questions upon which the indictment is based, at the time they were asked.

█ Giving due weight to the presumption of a valid legislative purpose in asking questions relevant to a permissible area of investigation, this court finds, as a matter of law, from a reading and realistic construction of the questioning of the witness Cross on July 16, 1957, in the setting of the record as a whole, and particularly in the light of the information which the Committee had on that date, the interpretation of Cross's former testimony on this subject by the Chairman and Counsel of the Committee, as well as the defendant, and the form of the specific questions put to the witness Cross on July 16th, that the recall of Cross was for the purpose of emphasizing the untruthfulness of his prior denial and to render him more liable to criminal prosecution. The Government, therefore, has failed to establish two' essential elements of the perjury charged in this indictment: that the al-

---

1. Letter of November 19, 1956, from the office of district attorney to J. W. Ehrlich, Esq., Attorney at Law, 333 Montgomery Street, San Francisco 4, Calif., read into the record of Committee hearings at p. 2809.

2. Although the witness Cross had specifically stated that he would not invoke the Fifth Amendment (Tr., p. 2787), this was not an irrevocable position.

leged false statements were before a competent tribunal, and that they were material.

Inasmuch as the Government has the burden of proving beyond a reasonable doubt each and every one of the elements of the criminal offense charged, it would have failed to sustain its burden even if it be held that it is equally likely that the Committee's purpose in recalling Cross was to elicit from him facts which might aid in legislation.

■ The ruling in this case is not to be interpreted as holding that a witness may never be recalled before a committee for additional testimony on a point already testified to, or that he may not be questioned about a prior denial, or that a committee may never address questions to a witness which are not clearly in aid of legislation. This court merely holds that a perjury indictment may not be found on false testimony in response to questions which are not asked for the purpose of eliciting facts material to the committee's investigation, that is, facts sought in aid of the legislative purpose.

The situation in this case is analogous to that in Bowers v. United States, 92 U.S.App.D.C. 79, 202 F.2d 447, 448, where a contempt conviction was reversed on the ground that the questions asked were not pertinent to the legislative purpose. There the Court stated:

"* * * It may often be proper, justifiable and ultimately helpful in the accomplishment of its investigative purposes for a Congressional committee to address to witnesses questions which it cannot demonstrate to be pertinent. But in branding a refusal to answer as a misdemeanor, Congress was careful to provide that the question must be 'pertinent to the question under inquiry.' It follows that, when a witness refuses to answer a question and the government undertakes to convict him of a criminal offense for not answering, then pertinency must be established. Presumption or possibility of pertinency will not

suffice." 92 U.S.App.D.C. at page 80, 202 F.2d at page 448.

■ The rationale of the Bowers decision has even stronger application to prosecutions for the felony of perjury. If there is probative evidence to the contrary, mere presumption or possibility of materiality will not suffice in a criminal prosecution where materiality is an essential element of the offense charged.

For the foregoing reasons, the court will grant the defendant's motion for a judgment of acquittal.