**UNITED STATES of America,**

v.

**Jeffrey M. LEVINE, Defendant.**

**Crim. No. 94–0034 (TPJ).**

United States District Court,
D. Columbia.

Aug. 19, 1994.

---

Richard N. Seaman, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, Jed Saul Rakoff, Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant.

William J. Birney, U.S. Atty's. Office, Washington, DC, Christopher B. Mead, Asst. U.S. Atty., Baltimore, MD, for U.S.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

The United States charges in a two-count indictment that the defendant Jeffrey Levine ("Levine") committed perjury on September 11, 1989, while testifying before the Subcommittee on Oversight and Investigations of the House of Representative's Committee on Energy and Commerce ("Subcommittee"), in violation of 18 U.S.C. § 1621. The government also charges that Levine made a false statement to the staff of the Subcommittee in a written submission furnished to the Subcommittee in advance of his testimony, in violation of 18 U.S.C. § 1001. Levine has moved to dismiss both counts of the indictment.

### I.

In 1984 Congress passed the Drug Price Competition and Patent Term Restoration Act, Pub.L. 98–417, which streamlined the regulatory procedure by which pharmaceutical companies could bring to market generic copies of previously approved drugs. This legislation permitted pharmaceutical manufacturers to submit "Abbreviated New Drug Applications" ("ANDAs") to the Food and Drug Administration ("FDA") for swift review and marketing approval for their products.[1] The nature of the generic drug industry is such that the pharmaceutical company that is first able to introduce its product to the marketplace acquires a significant economic advantage over competitors. The market advantages conferred by being the first to offer a drug for sale are temptations to abuses of the approval process, including,

1. The government explains that the law required drug companies to establish only that their generic copy of an already approved drug was "bioequivalent" to the original. In other words, if the generic copy displayed the same therapeutic action as the brand name already approved by regulators, then the generic manufacturer would receive permission to market the copy.

*inter alia,* illegal payments to FDA officials for preferential approval of ANDAs.

In 1988 the Subcommittee, FDA, and the U.S. Attorney's Office for the District of Maryland initiated separate investigations into such corrupt practices. The Subcommittee began public hearings in May, 1989, while the criminal probe by the U.S. Attorney had already resulted in agreements to plead guilty by certain pharmaceutical companies, their officers, and FDA officials, in the United States District Court for the District of Maryland.

Of direct concern to this case, the U.S. Attorney for Maryland had succeeded in obtaining an agreement to plead guilty from an official of Par Pharmaceutical, Inc. ("Par Pharmaceutical"), of which the defendant Jeffrey Levine was an Executive Vice–President. Ashok Patel, a senior Vice–President of Par Pharmaceutical agreed to plead guilty on April 7, 1989, to making an illegal gratuity payment to an FDA branch chief. On April 13, 1989, a review chemist in the Division of Generic Drugs at FDA, also agreed to plead guilty to receiving gratuity payments from both Patel and Dilip Shah, the President of Quad Pharmaceutical, Inc. ("Quad Pharmaceutical"), a subsidiary of Par Pharmaceutical. On July 11, 1989, Par Pharmaceutical agreed to plead guilty to providing an illegal gratuity to an FDA official. Patel actually entered his guilty plea on July 17, 1989, at which the Fed.R.Crim.P. 11 proffer stated that he had been involved in a scheme with Shah to pay gratuities to FDA officials on behalf of Par Pharmaceutical and Quad Pharmaceutical in conjunction with the submission of ANDAs for generic drugs which those companies aspired to bring to market.

By the time the Subcommittee began its public hearings on May 3, 1989, it had already interviewed scores of FDA officials, Department of Health and Human Service employees, and others in the private sector, and had also reviewed "tens of thousands" of pages of documents. In addition, the Subcommittee was also aware of the successful criminal investigations conducted by the U.S. Attorney's Office in Maryland, including the involvement of Par Pharmaceutical and Quad Pharmaceutical officials in the generic drug scandal.

Executives of Par Pharmaceutical, including defendant Levine, met with staff members of the Subcommittee on July 17, 1989, to explain the scope of their companies' participation in the illegal payments conspiracy. Par Pharmaceutical officials stated to the staff that only two of its officials, Patel and Shah, had been engaged in any illegal activities with respect to ANDA applications submitted to the FDA. However, on July 20, 1989, legal counsel for Par Pharmaceutical suggested to the Subcommittee that Jeffrey Levine may have assisted in suppressing evidence of other unlawful conduct by Patel, namely, the substitution of certain drug test data during a recent FDA inspection.

The Subcommittee issued subpoenas to Par Pharmaceutical and Quad Pharmaceutical employees, including to defendant Levine, on August 4, 1989. By this time, members of the Subcommittee had reason to suspect that Levine had misled its staff at the July 17, 1989 meeting, and those misgivings are evidenced by a letter written on September 7, 1989, to Judge John Hargrove of the U.S. District Court of Maryland, in which Congressmen John Dingell and Thomas Bliley, the Chairman and ranking minority member, respectively, of the Subcommittee, asserted that Levine had "attempted to mislead Subcommittee staff...."[2] Congressman Dingell also opined in a memorandum to staff on September 8, 1989, that "Levine should have had knowledge of [the illegal payments]," and again repeated the contention that the defendant had misled the Subcommittee staff on July 17, 1989.

Before testifying on September 11, 1989, defendant Levine voluntarily furnished a written declaration to the Subcommittee which he insisted be placed in the hearing record, and in which he stated that Par Pharmaceutical and Quad Pharmaceutical had "made mistakes." Levine also wrote that:

> [A] few individuals committed inexcusable acts for which they and we have accepted responsibility.... The U.S. Attorney's Office proposed that Par and Quad each

---

2. Judge Hargrove was scheduled to sentence Par on September 13, 1989.

plead guilty to the same offense to which its officer also would plead guilty. *In view of the fact that no one else at either company was knowingly involved,* we urged that the conviction and punishment of the two individuals should be sufficient....

\* \* \* \* \* \*

... [T]here is no evidence that any individual other than the two who have pleaded guilty and are not now with the companies, were knowingly involved in the [illegal gratuity] payments.[3]

The Subcommittee's hearings on September 11, 1989, devoted attention to the illegal activities of Par Pharmaceutical and Quad Pharmaceutical. FDA inspectors first testified that their investigation revealed that the companies had not only engaged in making illegal gratuity payments, but had also submitted false or altered data to the FDA in conjunction with their ANDAs. The Subcommittee then questioned Levine.

When Levine began his testimony, he stated that he "welcome[d] the opportunity" to present his side of the story before the Subcommittee, and acknowledged that Par Pharmaceutical and Quad Pharmaceutical, and he on "one occasion," had "made some serious mistakes." Levine acknowledged that he did not inform the Subcommittee staff on July 17, 1989, of "the one incident of misconduct of which I had personal knowledge." Chairman Dingell then began interrogating Levine, his questions directed to the illegal conduct of which Levine had knowledge, and when the defendant first learned of this activity. Dingell then asked Levine at what point he became apprised of the payments of illegal gratuities to FDA officials:

> Mr. Dingell: Were you in any way aware, prior to July 17, 1989, of illegal gratuities to FDA chemists and a supervisory chemist at FDA?
>
> Mr. Levine: Prior to July 17?
>
> Mr. Dingell: Yes.
>
> Mr. Levine: Yes.

> Mr. Dingell: You were aware of it prior to July 17?
>
> Mr. Levine: Yes.
>
> Mr. Dingell: When did you become aware of it?
>
> Mr. Levine: *The first instance was when Par and Quad received subpoenas by the U.S. Attorney in Baltimore, which was last summer.*
>
> Mr. Dingell: It was in 1988 that you became aware of this?
>
> Mr. Levine: *Yes.*

The United States contends that the italicized portions of this dialogue were knowingly false statements made by Levine under oath, and hence constituted perjury. This exchange is the basis for Count I of the indictment.

Subsequent to the Subcommittee hearings, the Congress eventually passed legislation, *see* Generic Drug Enforcement Act of 1992, Pub.L. No. 102–282, which provided for the imposition of penalties on pharmaceutical corporations and individuals engaged in illicit conduct in relation to matters before the FDA, including monetary fines, the permanent debarment of companies engaged in unlawful activity with respect to the ANDA process, and the permanent debarment of "high managerial agents" with actual knowledge thereof. The United States represents that this legislation derived from bills passed out of the Subcommittee, its sponsors approvingly citing the Subcommittee investigation as the source of evidence demonstrating the necessity for "strong action" to safeguard the generic drug approval process.

## II.

■ Levine contends that Count I, which charges him with committing perjury, 18 U.S.C. § 1621, while testifying before the Subcommittee on September 11, 1989, must be dismissed, because that body did not have a "valid legislative purpose" when Chairman Dingell inquired of Levine when he first be-

---

**3.** The government apparently later obtained information from which it has concluded that the underlined portions of these statements were false, and these assertions form the basis for Count II of the indictment. The government

alleges in the indictment that Levine knew of gratuity payments "at least as early as May 1987," and that Levine himself was "knowingly involved in the payment of gratuities."

came aware of illegal gratuity payments by company officials. The Subcommittee was not, therefore, a "competent tribunal" within the meaning of the statute.[4]

Levine submits that when he was summoned to testify, the Subcommittee already possessed extensive information regarding improprieties in the generic drug industry in general, and the involvement of the defendant's companies, Par Pharmaceutical and Quad Pharmaceutical, in particular. The defendant insists that the specific questions asked by Chairman Dingell which elicited the allegedly perjured statement were not designed to add to the Subcommittee's knowledge of problems in the generic drug industry, could not have aided in the formulation of new legislation, and were merely designed to "set up" Levine for a perjury charge. This proposition is bolstered, he says, by the Dingell/Bliley letter to Judge Hargrove on September 7, 1989, and Chairman Dingell's memorandum to staff of September 8, 1989, expressing the suspicion that Levine had already misled the Subcommittee staff on July 17, 1989.[5] The Subcommittee was thus not acting as a "competent tribunal" within the meaning of the statute, as Members of the Subcommittee only desired to induce Levine to testify falsely, and therefore the charge should be dismissed. *See United States v. Icardi*, 140 F.Supp. 383 (D.D.C.1956); *United States v. Cross*, 170 F.Supp. 303 (D.D.C.1959).

In *Icardi*, a district court judge granted a motion for judgment of acquittal in a perjury prosecution when he found that congressional questioning of a witness suspected of committing murder during World War II hostilities was not designed to inform any further legislation, but was only concerned with establishing the guilt or innocence of the accused of a crime allegedly committed more than a decade earlier. Because the questioning at the hearing advanced no valid legislative purpose, the subcommittee at issue in that case was not a "competent tribunal" within 18 U.S.C. § 1621. Three years later the *Icardi* court judge, also presiding over the *Cross* trial, granted a motion for judgment of acquittal in similar circumstances, upon his finding that a congressional committee had recalled a suspected corrupt labor leader for a second session of testimony *only* in order to strengthen a perjury case which the committee already planned to refer to the U.S. Attorney's Office for prosecution.

*Icardi* and *Cross* are readily distinguishable on grounds of timing alone. Levine requests that this Court make findings of fact based solely on a paper record in advance of trial without benefit of any oral testimony whatsoever.[6] Indeed he concedes, as he must, that the evidence that the Subcommittee was not a "competent tribunal" is at best circumstantial. The defendants in *Icardi* and *Cross*, however, obtained relief on motions for judgment of acquittal at the conclusion of trials on records which included oral testimony and cross-examination by able counsel. *See also, United States v. Clarridge*, 811 F.Supp. 697, 709 (D.D.C.1992) (tri-

---

**4.** 18 U.S.C. § 1621 states in pertinent part:
Whoever—
(1) having taken an oath before a *competent tribunal* ... that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true ... is guilty of perjury. (emphasis added).

**5.** Levine also stresses that Chairman Dingell prefaced some of his questions pertaining to the defendant's knowledge of unlawful activity with, "Prior to July 17...." Levine argues that this emphasis on the date underscores the impropriety of the line of questioning: Chairman Dingell's interest was focused upon his earlier suspicions that Levine had misled the Subcommittee staff on that date.

In context, the Chairman's mention of the July 17th date is equivocal. It was as likely merely a convenient temporal reference point—Levine himself had first alluded to it—as it was the factual predicate for a perjury charge. In any event, it forms no part of the pending charges. Levine is *not* accused of lying about his knowledge as of July 17th, but, rather, as to *when he did* acquire knowledge.

**6.** Levine argues that the record is sufficiently clear to allow the Court to conclude that the Subcommittee was not acting as a "competent tribunal" when it questioned him. In the alternative, however, he requests a pre-trial hearing to establish the invalidity of the Subcommittee's motives when it issued its subpoena.

al will allow counsel to elicit testimony of congressional motives when calling former CIA official to testify on Iran–Contra matters).[7] This Court will likewise allow the case to proceed to trial to develop a full evidentiary record.

■ Moreover, even conceding that the factual record at present may be suggestive of an ulterior motive, it is apparent at this stage of the proceedings that the precise question posed to Levine, namely, when did he first become aware of the payment of illegal gratuities by executives in his own company, also furthered a "legitimate legislative purpose" as well, in that it would tend to reveal the extent to which managerial oversight could be relied upon to detect and deter corrupt activities pervading the generic drug industry.

Par Pharmaceutical and Quad Pharmaceutical (and Levine) represented that the unlawful conduct of their companies was perpetrated by only two "bad apples." Evidence that Levine had misled the Subcommittee on July 17, 1989, raised the possibility that Levine not only had knowledge of illegalities earlier, but might well have condoned or been an accomplice in such deeds. It would be significant for any congressional committee considering further legislation regulating the generic drug industry to know whether such incidents were merely isolated events, or were so pervasive that they had become commonly accepted practices in an industry of which Quad Pharmaceutical and Par Pharmaceutical were paradigms. Hence, the precise question addressed to Levine advanced a "legitimate legislative purpose," and the Court concludes preliminarily upon this record that the Subcommittee was a "competent tribunal" as defined in 18 U.S.C. § 1621.

### III.

■ Levine also urges the Court to dismiss Count II of the indictment, which charges him with making a false statement to the Subcommittee in a written submission provided voluntarily prior to his oral testimony on September 11, 1989, in violation of 18 U.S.C. § 1001.[8] Levine had stated that no one else at Par Pharmaceutical and Quad Pharmaceutical was "knowingly involved" in the payment of gratuities to FDA. The defendant maintains that whether or not others were "knowingly involved" in gratuity payments "goes solely" to the question of whether those individuals committed a crime, a question reserved to the executive branch and the courts. Because the statement "relates to a matter into which the subcommittee could not appropriately inquire," he says, it was not "within the jurisdiction" of the Subcommittee as required by statute.

This argument is simply a reprise of his argument on Count I with variations dictated by the difference in statutory language. The Supreme Court has counselled that the word "jurisdiction" in the false statements statute is not to be constrained to a "narrow or technical meaning." *United States v. Rodgers*, 466 U.S. 475, 479–80, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984). Quite clearly the U.S. Congress has the power to probe corruption and illegal activities in the industries it regulates, and the issue of whether other officials of Par Pharmaceutical and Quad Pharmaceutical were "knowingly involved" in unlawful conduct goes to the extent and pervasiveness of that corruption. The statement therefore falls within the "jurisdiction" of the Subcommittee, and violation of 18 U.S.C. § 1001 has been properly charged.

Therefore, it is, this <u>19th</u> day of August, 1994,

ORDERED, that defendant's motion to dismiss Count I of the indictment is denied without prejudice; and it is

> Whoever, *in any matter within the jurisdiction of any department or agency of the United States* knowingly and willfully ... makes any false statements or representations ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.
> (emphasis added).

---

**7.** Whether or not the Subcommittee was a "competent tribunal" as contemplated by 18 U.S.C. § 1621 is, however, a question of law for this Court to determine. *Cross*, 170 F.Supp. at 305.

**8.** 18 U.S.C. § 1001 reads:

FURTHER ORDERED, that defendant's motion to dismiss Count II of the indictment is denied with prejudice.