972 F.2d 343
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Edward D. JAMESON, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Joyce C. Jameson, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Charles Anderson Miller, a/k/a Sonny Miller, a/k/a Bubba,
Defendant-Appellant.
 Nos. 91-5848, 91-5849, 91-5876.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 8, 1992
Decided: July 29, 1992
 
 Appeals from the United States District Court for the Eastern District of North Carolina, at Fayetteville.
 Jack Edmond Carter, Fayetteville, North Carolina, for Appellant Miller.
 James Riley Parish, Fayetteville, North Carolina, for Appellant Joyce Jameson.
 James Michael Walen, Fayetteville, North Carolina, for Appellant Edward Jameson.
 John Stuart Bruce, First Assistant United States Attorney, Raleigh, North Carolina, for Appellee.
 Margaret Person Currin, United States Attorney, Raleigh, North Carolina, for Appellee, on brief.
 E.D.N.C.
 AFFIRMED.
 Before ERVIN, Chief Judge, WILLIAMS, Senior United States District Judge for the Western District of Virginia, sitting by designation, and WILLIAMS, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 Charles A. Miller ("Miller"), Edward D. Jameson ("Ed Jameson"), and Joyce C. Jameson ("Joyce Jameson") appeal their convictions and sentences imposed by the district court. We affirm.
 
 I.
 
 2
 On October 18, 1985, the United States Department of the Army awarded Earth Property Services ("EPS") a family housing maintenance ("FHM") contract for the maintenance of approximately 4,800 units of family housing on Fort Bragg, North Carolina. Under the FHM contract, EPS was paid a monthly fixed fee to perform: (1) routine and emergency maintenance; (2) seasonal maintenance on heating and air-conditioning systems; (3) exterior maintenance; and (4) "between occupancy maintenance." EPS was to provide all equipment and materials necessary for the maintenance, unless the contract specifically provided that EPS would be reimbursed for such items. These reimbursable items were known as "bid items" and included countertops, window shades, vanities, range hoods, and thermopane glass.
 
 
 3
 The Army's Director of Engineering and Housing ("DEH") at Fort Bragg monitored contract performance. DEH inspectors were required to inspect the installation of all bid items and all other aspects of EPS' performance. In short, the inspectors were the government's "eyes and ears," responsible for making sure EPS performed the work required by the contract. During the performance of the contract, EPS submitted a monthly invoice to the inspectors. A DEH inspector would certify the invoice. The invoice would then be forwarded to the finance office with a receiving report, form DD 250, for payment. Pursuant to each invoice, a United States Treasury check was mailed by the government to EPS.
 
 
 4
 Ed Jameson was the lead DEH inspector on the FHM contract. His duties included checking on the performance of the seasonal maintenance for heating and air-conditioning, checking the exterior maintenance, and verifying that the bid items had been installed. Joyce Jameson is Ed Jameson's wife. Miller was EPS' principal foreman on the FHM contract. Miller's title was later changed to Operations Manager. Miller was in charge of the field operations for EPS.
 
 II.
 
 5
 Ed Jameson and Joyce Jameson appeal the district court's denial of their motion to suppress. We affirm.
 
 
 6
 On March 15, 1990, Special Agent Alan R. Hobbs of the Federal Bureau of Investigation ("FBI") and Special Agent Stanley E. Poston of the Defense Criminal Investigative Services ("DCIS") travelled to Topsail Beach, North Carolina and located the Jamesons' beach home. Agents Hobbs and Poston ascended the front stairs and peered into the residence through a sliding glass door. They saw a butcher block countertop in the kitchen area. This caught their attention because they were investigating the loss of butcher block countertops from Fort Bragg. Agents Hobbs and Poston also noticed signs in the front yard indicating the house was for rent and for sale through Topsail Realty Company.
 
 
 7
 The agents travelled to Topsail Realty and Agent Hobbs told the clerk on duty that he would like to view the Jamesons' property. Agents Hobbs and Poston then truthfully filled out forms requesting their name, address and automobile license number. The clerk stated that no real estate agent was on duty, but gave Agents Hobbs and Poston a key to the Jamesons' home. The agents did not disclose that they were with the FBI and DCIS.
 
 
 8
 Agents Hobbs and Poston then went to the Jamesons' house and used the key to enter. Once inside, they opened the kitchen cabinet doors and examined the underside of the countertop. The agents observed the letters "EPS" and also "127 Seay" written on the underside of the countertop. Agent Hobbs knew that 127 Seay was an address at Fort Bragg and the agents believed EPS stood for Earth Property Services. The agents also entered an unlocked storage area on the ground floor and found a cardboard box containing stair treads. This box was labeled with a Fort Bragg address. The real estate agent arrived and Agent Hobbs returned the key. Agents Hobbs and Poston did not inform the real estate agent that they were with the FBI and DCIS. The agents departed without removing anything from the beach house.
 
 
 9
 On March 29, 1990, Agents Hobbs and Poston obtained a search warrant for the Jamesons' beach home. On March 30, 1990 Agents Poston and Stephen C. Miller of DCIS travelled to the beach house, where they found the Jamesons in the front yard. Agent Poston and Agent Miller identified themselves and displayed their badges. Agent Poston told Mr. Jameson that he had a search warrant for the house. Mr. Jameson responded that the agents could not remove anything because everything in the house was "bought and paid for." Agent Poston replied that he did have a search warrant and that he could seize anything listed on the search warrant. Mr. Jameson then replied that the agents could look at the house as much as they desired, but could not remove anything.
 
 
 10
 By this time, Ed Jameson had become somewhat agitated. Agent Miller suggested that they go inside the house. Mr. Jameson agreed and told the agents to come in and look at anything they desired. Once inside, the Jamesons repeated this invitation. At that point, Agent Hobbs arrived and photographed the countertop and dishwasher. Agent Hobbs took the box of stair treads with Mr. Jameson's consent. The agents did not remove the countertop. The agents later returned the search warrant unexecuted.
 
 
 11
 June 26, 1990, Agent Poston and Agent Ben Pruitt of the DCIS returned to the Jameson's beach home with a search warrant. The agents seized the countertop.
 
 
 12
 Defendants assert that: (1) the March 15 entry was unreasonable because the alleged consent by the realty agent, to whom the agents had not disclosed their true purpose, was constitutionally invalid; (2) on March 30, 1990, the Jamesons acquiesced to a claim of lawful authority rather than voluntarily consenting to the search; and (3) the June 26 warrant was based on information which was"fruit of the poisonous tree" and was therefore invalid. We disagree.
 
 
 13
 Even assuming that the Jamesons had a reasonable expectation of privacy, as defined in Katz v. United States, 389 U.S. 347 (1967), in a home which was available for viewing through the realty company, the March 15 entry was with the consent of the Topsail Realty employee. The fact that the agents did not disclose their true identity to the Topsail Realty employee did not render her consent invalid. The agents were not required to disclose their true purpose for wishing to enter the home. See Lewis v. United States, 385 U.S. 206, 20810 (1966). "A government agent may obtain an invitation onto property by misrepresenting his identity, and if invited, does not need probable cause nor warrant to enter so long as he does not exceed the scope of his invitation." United States v. Scherer, 673 F.2d 176, 182 (7th Cir.), cert. denied, 457 U.S. 1120 (1982). Once inside the beach house, the agents acted exactly as potential renters or purchasers would be expected to act and thus did not exceed the scope of the consent. Thus, the search was pursuant to a valid third-party consent. Stoner v. California, 376 U.S. 483 (1964).
 
 
 14
 The district court found that the Jamesons voluntarily consented to the March 30 search. This finding must be affirmed on appeal unless clearly erroneous. United States v. Gordon, 895 F.2d 932, 938 (4th Cir.), cert denied, 111 S. Ct. 131 (1990). The question of voluntariness turns on the totality of the circumstances surrounding consent. Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973). The government must prove voluntariness by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 177 (1974).
 
 
 15
 Consent is not free and voluntary if given only in acquiescence to claim of lawful authority. Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968). However, Bumper is not controlling. Here, the agents possessed a valid search warrant for the property. Rather than execute the warrant, the agents relied on the Jamesons' invitation to examine the home. This offer was first made in the yard and was repeated once the agents were inside the home. Therefore, the district court's finding is not clearly erroneous and must be affirmed.
 
 
 16
 The June 26 entry was pursuant to a valid search warrant supported by probable cause. The question of probable cause to search an item is determined by reference to the totality of the circumstances. United States v. Sokolow, 490 U.S. 1 (1989). Probable cause to conduct a search exists when the facts would lead a person of reasonable caution to believe that a crime has been committed. United States v. Laughman, 618 F.2d 1067, 1072 (4th Cir.), cert. denied, 447 U.S. 925 (1980). Probable cause in this case was clearly present based on the information obtained from the two prior lawful searches of the residence. Therefore, we affirm the district court's denial of the motion to suppress.
 
 III.
 
 17
 Ed Jameson and Miller appeal the sentences imposed by the district court. They assert that the trial court improperly computed the loss to the government at $5 million and attributed this loss to them at sentencing. We disagree.
 
 
 18
 The probation office found five categories of loss: (1) deductions which should have been taken from amounts paid under the contract for nonperformance of seasonal maintenance, $311,812.98; (2) the approximate value of goods taken from the SHIP store, $300,000; (3) billings to the government for thermopane glass in excess of the amount ordered from EPS vendors, $36,651; (4) billings to the government for window shades in excess of that ordered from EPS vendors, $23,840; and (5) cost to the government due to massive nonperformance of the contract, $4,549,070.48. This totalled $5,221,374.46. The court accepted this amount.
 
 
 19
 The determination of the amount of loss is essentially a factual question, requiring the court to accept the district court's conclusions unless they are clearly erroneous. See United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir. 1989). The sentencing guidelines allow values to be "inferred from any reasonably reliable information available" and do not require the loss to be determined with precision. U.S.S.G. § 2B1.1, comment. (n. 3). The government meets its burden of proof if the value can be so inferred by a preponderance of the evidence. United States v. Harris, 882 F.2d 902, 907 (4th Cir. 1989) (preponderance proper standard of proof in resolving factual disputes regarding sentencing).
 
 
 20
 The government's witness, Gary L. Shepard, testified concerning the loss both at trial and during sentencing. Shepard testified that the amount ultimately accepted by the district court was the proper amount. The defendants offered no contrary proof. Based on this evidence, the trial court's holding was not clearly erroneous.
 
 IV.
 
 21
 Miller asserts that the district court erred in denying his motion for judgment of acquittal in that the government failed to prove that he knowingly participated in a conspiracy or that he aided and abetted certain offenses. In order to address this issue, we must conduct a review of the relevant facts.
 
 A.Factual Background
 1.Gratuities
 
 22
 The evidence shows that, over the course of the contract, government employees received gratuities from EPS employees, including Miller.
 
 
 23
 a.Jackie E. Stowers
 
 
 24
 Jackie E. Stowers ("Stowers") was the chief construction inspector for DEH. Stowers oversaw the DEH inspectors on the FHM and other contracts. In October, 1985, EPS purchased two new lawn tractors with a retail value of $2,165 each. In about May, 1986, EPS personnel delivered one of these mowers to Stowers. (Tr. at 69). Stowers wrote a check for $300 to Robert J. Salmon, Jr. ("Salmon"), who together with his wife and two sons owned EPS, to pay for the tractor. (Tr. at 35, 69). In June, 1986, Stowers bought a new tractor and received a $1,450 trade-in on the tractor he received from EPS.
 
 
 25
 In approximately March, 1989, Miller directed an EPS paint crew to travel off Fort Bragg and paint portions of Stowers' house. (App. at 322, 490). Some of the paint used to paint Stowers' house belonged to EPS. (App. 311). The EPS workers were paid their regular wages for that day's work. (App. 314). Miller later arranged to have a bogus receipt prepared for the job. (App. at 325-26). The evidence also showed that on a separate occasion, Miller delivered pipe to Stowers' residence. (Tr. at 71).
 
 
 26
 b. Ed Jameson
 
 
 27
 Ed Jameson was the lead DEH inspector on the FHM contract. Jameson also received a lawn tractor from EPS in August, 1986. On January 8, 1987, Jameson wrote a check for $450, allegedly to pay for the tractor. However, Salmon never cashed the check. (Tr. at 36, 80). Agents investigating the case discovered that Jameson still owned the tractor at the time of the investigation. Miller directed an EPS workman to draw plans for the countertop later discovered in Jameson's beach house. (App. 416-17). The countertop was made by Marsh Kitchens and picked up by Ed Jameson. At Miller's request, Tammy Faircloth[1] ("Faircloth") prepared a work order which falsely stated the countertop was installed on base. (App. 471-75). EPS billed the government for the countertop as if it had been installed on base. (App. 250, 892-93). On one other occasion, Miller told Faircloth that Jameson was going to pick up a countertop. (App. 480-82). Miller also directed EPS employees to order mini-blinds for Jameson. (App. 50405).
 
 
 28
 c. Pete Taylor
 
 
 29
 Pete Taylor ("Taylor") was at one time a DEH inspector. (Tr. at 113). Miller directed an EPS employee to place a new countertop into Miller's personal van. Miller told Faircloth this countertop was for Taylor. (App. 482-83, 576). The countertop was billed to the government as if it had been installed on the base. Miller also directed an EPS employee to install a dishwasher at Taylor's home. (App. 414).
 
 2.Theft
 
 30
 The evidence also shows that EPS employees, including Miller, stole government property. Miller directed EPS employees to load vanities into his personal van. (App. 413). On one occasion, Miller directed a carpenter to place an almost new toilet into Miller's personal van. (App. 431). The evidence also shows that, in addition to the countertop installed in Jamesons' beach house, several other countertops which were billed to the government were not installed on Fort Bragg.
 
 
 31
 Miller also arranged to have a kitchen sink, dishwasher, and water heater installed in the Faircloth's home. (App. 415, 491, 494). Later, after a search warrant had been served on EPS headquarters, Salmon directed Miller to remove the dishwasher. (App. 495). Miller directed a workman to go to Faircloth's home and replace her dishwasher with one that Miller bought. (App. 415, 495). Ultimately, Salmon paid for the new dishwasher. (App. 495). Miller and Jameson also arranged to get a countertop for Faircloth's residence. (App. 492).
 
 
 32
 Miller was also involved in taking items from the"Self Help Issue Point" ("SHIP store"). The SHIP store is basically a hardware store from which military personnel could receive household items at no cost. (App. at 362). EPS was not entitled to draw materials from this store and Ed Jameson and Stowers had been told this. (App. at 36163). However, the evidence showed that Ed Jameson would frequently drop by the SHIP store and look around the warehouse. The next day, an EPS employee, usually Faircloth, would call and request certain items. (App. at 366-68). EPS employees, including Miller, would later go to the SHIP store and pick up the items. (App. at 365, 373, 408, 456). Also, Faircloth testified that Salmon would call and complain that she was spending too much money on supplies. He would then instruct her to get items from the SHIP store. (Tr. at 868). These items would then become a part of EPS' inventory. (App. 555). When EPS ultimately used the items, they were billed to the government as if purchased from a vendor. (App. 452). In this way, the government actually paid for certain items twice.
 
 3.False Invoices
 
 33
 In addition to the gratuities and theft, the evidence shows that EPS did not comply with the contract and, as a result, submitted false claims to the government for payment. Miller instructed an EPS workman to install a vinyl floor over a tile floor, although the contract called for the tile to be replaced with tile. (App. 432, 463). This was done because it was cheaper and quicker. Also, EPS could bill the government for the vinyl. (App. 463).
 
 
 34
 On another occasion, Miller approached an EPS worker and asked him to sign a work order stating that a kitchen countertop had been installed. (App. 433). This worker refused to sign the work order because he had not installed the countertop, however another EPS employee signed the work order. (App. 434).
 
 
 35
 Miller instructed workmen to remove splash blocks, which are placed at the bottom of gutter downspouts, from homes already inspected and take them to other houses due to be inspected. (App. 435-36). These houses would then pass inspection.
 
 
 36
 The evidence also showed false claims involving thermopane glass. Miller told Al Davis, the EPS employee that ordered and installed thermopane glass, to record the total amount of thermopane glass ordered for a house on the work order, even if all the panes were not actually installed. (App. 502, 563). Davis stated he billed for glass not installed on many occasions. (App. 580). Davis stated that he did so out of fear that Miller would fire him if he did not. (App. 586). Davis also got the DEH inspectors to sign blank work orders. (App. 584).
 
 
 37
 Seasonal maintenance was required twice yearly on each home, once for the air-conditioning and once for the heating. The EPS worker doing the maintenance was required to complete a checklist. Proper maintenance required approximately one hour to perform. Faircloth told Miller that Salmon did not want proper maintenance done on the heating and cooling. (App. 467). Salmon had said to just wipe the units down and keep going. (App. 467). Miller told the EPS employees to turn the units on, and, if they worked, to get the form signed. (App. 600, 622). The workers testified that after this meeting, they did not properly perform the preventive maintenance. (App. 600, 622). The workers stated that they would spend approximately ten minutes per home or simply sign the checklist without going to the home.
 
 B.Sufficiency of the Evidence
 
 38
 The appropriate standard for appellate review is as follows:
 
 
 39
 The guidelines for reviewing the sufficiency of the evidence to support a conviction are quite familiar. The relevant question is not whether the appellate court is convinced of guilt beyond a reasonable doubt, but rather whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt. We must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established.
 
 
 40
 United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982) (citations omitted).
 
 1. Conspiracy
 
 41
 Count 1 charged Miller with conspiring to defraud the government by, among other things, depriving the government of its money and property and by corrupting and deceiving government employees assigned to monitor performance of the FHM contract. (App. 36). Count 2 charged Miller with conspiring to commit offenses against the government including making false claims, paying illegal gratuities, and stealing government property. (App. 45).
 
 
 42
 A conspiracy is the agreement between two or more individuals to commit in concert a criminal act. United States v. Giunta, 925 F.2d 758, 764 (4th Cir. 1991). "In order to support a conviction for conspiracy, the government must show, first, that a conspiracy existed; then, that the defendant had knowledge of the conspiracy; and finally, that the defendant voluntarily became a part of the conspiracy." United States v. Bell, 954 F.2d 232, 236 (4th Cir. 1992).
 
 
 43
 The evidence clearly supports Miller's convictions in Counts 1 and 2. There is no doubt that a conspiracy existed between the parties named in the indictment to defraud the government and to commit offenses against the government. Regarding the gratuities, Salmon told Faircloth to "do what we needed to do to keep the inspectors happy." (App. at 538). Faircloth then passed this directive along to Miller. (App. 467). The evidence disclosed that this included selling Stowers a lawn tractor at one-fifth of its value and, in essence, giving one to Ed Jameson. Miller played a major role in dispensing the gratuities in that he directed the EPS paint crew to paint Stowers' residence, he directed an EPS employee to place a countertop in his van for Taylor, and he initiated the process of getting a countertop for Ed Jameson. This last incident, in and of itself, proves the conspiracy. Miller and Ed Jameson obviously came to an arrangement whereby Miller ordered a countertop for Jameson to pick up at Marsh Kitchens. First, Miller had an EPS employee draw a diagram of a countertop which could not fit in 127 Seay on Fort Bragg. Miller then enlisted the help of Faircloth who prepared a false work order stating that the countertop was installed on the base. Pursuant to this work order, EPS billed the government for the countertop.
 
 
 44
 The evidence also shows a conspiracy to steal government property. After a search warrant was served on EPS headquarters, Salmon directed Miller to remove a stolen dishwasher from Faircloth's home. Miller then ordered EPS workers to do so, and Salmon paid for a replacement to be installed. This shows the chain of command in the conspiracy. Also, the theft from the SHIP store illustrates that the EPS employees and DEH inspectors worked together to steal from the government. Ed Jameson served as a scout to determine what shipments the SHIP store had received. Faircloth would then call and request the items and send EPS employees, including Miller, to retrieve the items. The items were then billed to the government as if purchased from a third party.
 
 
 45
 The evidence also shows a conspiracy to submit false invoices to the government. Miller correctly asserts that, as foreman, he was not responsible for preparing invoices and billing the government. (App. at 550, 556). However, the evidence shows that he did get workers to sign work orders for work they had not performed. The evidence also shows that Miller told Al Davis to bill for thermopane glass which he had not actually installed. Also, Faircloth told Miller that Salmon did not want the seasonal maintenance performed properly. Miller told the EPS workers not to properly perform the seasonal maintenance. Thus, although Miller did not directly prepare the false invoices, he was part of the conspiracy to submit false invoices. This evidence proves the conspiracies by both direct and indirect evidence. Therefore the convictions in Count 1 and 2 are affirmed.
 
 2. False Claims on Monthly Invoices
 
 46
 Counts 3-38 charged Miller with aiding and abetting the making of false claims to the government with respect to EPS' monthly invoices from May, 1986 to June, 1989. "Simply put, 'aiding and abetting means to assist the perpetrator of the crime.' " United States v. Horton, 921 F.2d 540, 543 (4th Cir. 1990), cert denied, 111 S. Ct. 2860 (1991) (quoting United States v. Williams, 341 U.S. 58, 64 (1951)). To prove aiding and abetting, the government must show that the defendant "knowingly associated himself with and participated in the criminal venture." Flowers v. Tandy Corp., 773 F.2d 585, 590 (4th Cir. 1985).
 
 
 47
 The evidence shows that each of these invoices billed for seasonal maintenance was not performed. The evidence which supports the convictions for conspiracy in Counts 1 and 2 also supports Miller's convictions on these counts. The evidence shows that Miller instructed the EPS employees not to perform the seasonal maintenance required by the contract properly. This resulted in the submission of false invoices. Thus, these activities aided and abetted the submission of false claims.
 
 3. Mail Fraud
 
 48
 Counts 42-98 parallel Counts 3-38 and charge Miller with aiding and abetting mail fraud. The evidence showed that, for each false invoice submitted, the government mailed EPS a check. The fact that Miller played a role in submitting the false invoices likewise supports his conviction for Counts 42-98.
 
 4. False Claims-Thermopane Glass
 
 49
 Miller also challenges the counts charging him with aiding and abetting false statements on particular work orders billing for thermopane glass.[2] Miller told Davis to bill for all glass ordered even if it was not installed. Davis stated he billed for glass not actually installed because he was afraid Miller would fire him. This was sufficient to convict Miller for aiding and abetting.
 
 V.
 
 50
 Miller asserts that the trial court erred in enhancing his base offense level because he was a manager or supervisor as defined in U.S.S.G. 3B1.1(b). We disagree.
 
 
 51
 The district court's factual determination of a participant's role is reviewed for clear error. United States v. Sheffer, 896 F.2d 842, 846 (4th Cir.), cert. denied, 111 S. Ct. 112 (1990). Section 3B1.1(b) requires an increase in the defendant's base offense level if he was a "manager or supervisor" and the criminal activity involved "five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). The evidence showed that Miller directed the EPS paint crew to travel off base and paint Stowers' home. The evidence also shows that Miller met with the EPS maintenance workers and instructed them not to properly perform the seasonal maintenance on the air-conditioning and heating. This evidence supports the district court's finding. Therefore, we find no error in the district court's finding that Miller was a manager or supervisor of the criminal activity.
 
 VI.
 
 52
 Defendant Ed Jameson asserts that his convictions on four counts of false statements based on his financial disclosure statements are multiplicitous. We disagree.
 
 
 53
 During the investigation, agents obtained two of Jameson's Confidential Statement of Affiliations and Financial Interests, ("CSAFI"). Jameson had signed a CSAFI on September 15, 1987. On this form, question number 6 requested disclosure of all creditors other than those providing conventional loans. Jameson answered"None." Question number 7 asked him to list interests in real property other than his personal residence. Jameson answered "None." On September 7, 1988, Jameson again completed a CSAFI and again answered "None" to questions 6 and 7. All of these statements were false. Jameson owned a beach house in addition to his personal residence and had taken a non-conventional loan to purchase the property.
 
 
 54
 Jameson was indicted on four counts of giving false statements under 18 U.S.C. § 1001. Count 174 charged defendant with a false answer to question 6 on September 15, 1987, Count 175 charged defendant with a false answer to question 7 on September 15, 1987, Count 176 charged defendant with a false answer to question 6 on September 7, 1988, and Count 177 charged defendant with a false answer to question 7 on September 7, 1988.
 
 
 55
 "Multiplicity is the charging of a single offense in more than one count." United States v. Seagall, 833 F.2d 144, 145 (9th Cir. 1987). The danger of multiplicity is that it may lead to multiple sentences for a single offense, and it may prejudice the jury by creating the impression that the defendant has committed several offenses where there may have been only one. United States v. Duncan, 850 F.2d 1104, 1108 n.4 (6th Cir. 1988). The test for multiplicity is whether each count charged "requires proof of a fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304 (1932). Review of this issue is de novo. United States v. Mayberry, 913 F.2d 719, 724 (9th Cir. 1990).
 
 
 56
 Jameson asserts that the government has indicted him four times for what should have been a single charge. First, Jameson asserts that Count 175 is multiplicitous of Count 174 and Count 177 is multiplicitous of Count 176 because he cannot be charged with more than one count per CSAFI. However, "each nonidentical false statement made ... may be charged as a separate violation of section 1001." Seagall, 833 F.2d at 146. Proof of different facts was required for each count. In Count 174 and 176, the government had to prove Jameson owed a debt. In Counts 175 and 177, the government had to prove Jameson owned the beach house. Therefore, Jameson could be charged with two counts per document.
 
 
 57
 Jameson next asserts that Count 176 is multiplicitous of Count 174 and Count 177 is multiplicitous of Count 175 because Counts 176 and 177 are merely restatements of the false answers underlying Counts 174 and 175. Jameson cites United States v. Olsowy for the proposition that "where identical false statements ... are made in response to identical questions, the declarant may be convicted only once." 836 F.2d 439, 443 (9th Cir. 1987), cert. denied, 485 U.S. 991 (1988).
 
 
 58
 However, for Olsowy to apply, the evidence must show that a "declarant was asked the same question and gave the same answer." United States v. Salas-Comacho, 859 F.2d 788, 791 (9th Cir. 1988). Here, the questions were not identical. The questions underlying Counts 174 and 175 dealt with debts owed and property owned as of September 15, 1987 while the questions underlying Counts 176 and 177 dealt with debts owed and property owned as of September 7, 1988. To prove counts 176 and 177, the government needed to show the additional fact that these debts were still owed and property was owned as of September 7, 1988. "Where false statements are made in distinct and separate documents requiring different proof as to each statement, the filing of each false document constitutes a crime, and each filing may be alleged in a separate count of the indictment." See United States v. Guzman, 781 F.2d 428, 432 (5th Cir.), cert. denied, 475 U.S. 1143 (1986).
 
 VII.
 
 59
 Joyce Jameson asserts that the district court erred in increasing her base offense level pursuant to U.S.S.G. § 2J1.3(b)(2). We disagree.
 
 
 60
 On April 24, 1990, Joyce Jameson appeared before the grand jury. When asked about the countertop in her beach house, she stated that "EPS" and "127 Seay" were not written on the underside of the countertop when it was installed. She was later convicted of perjury. The district court increased her base offense level by three levels because the court found the perjury resulted in a substantial interference with the administration of justice as contemplated by U.S.S.G. § 2J1.3(b)(2). Specifically, the district court found that her perjury had caused the unnecessary expenditure of substantial government resources. After the March 30 search of the Jameson's beach house, the agents had decided not to remove the countertop. However, after Mrs. Jameson's perjury, the agents returned to the beach house and, on June 26, removed the countertop. This necessitated a new search warrant, removal of the counter, storage of the countertop, transportation of the countertop to trial. The total cost was over $5,000.
 
 
 61
 U.S.S.G. § 2J1.3(b)(2) states, "If the perjury or subordination of perjury resulted in substantial interference with the administration of justice, increase by three levels." There is a"substantial interference with the administration of justice" enhancement where such interference results in "unnecessary expenditure of substantial governmental ... resources." United States v. Dudley, 941 F.2d 260, 265 (4th Cir. 1991), cert. denied, 112 S. Ct. 908 (1992) (citing U.S.S.G. § 2J1.3(b)(2), comment. (n.1).). This appeal concerns the application of this statutory provision and not an upward departure. Id. at 264 n.3. We find that the district court was not clearly erroneous in finding that the perjury resulted in the unnecessary expenditure of substantial governmental resources. Therefore, this issue is affirmed.
 
 VIII.
 
 62
 For the foregoing reasons, we affirm the convictions and sentences imposed on Miller, Ed Jameson, and Joyce Jameson.
 
 AFFIRMED
 
 
 [1]
 Tammy Faircloth was the FHM contract project manager for EPS. At trial, Ms. Faircloth had married and testified as Tammy Faircloth McClellan
 
 
 [2]
 The counts dealing with thermopane glass that were submitted to the jury were:, 180-82, 184, 186-93, 196-97, 199-200, 203-10, 212-14, 215-17, 219, 221-22, and 224. In his brief, Miller incorrectly identified these counts as 178-271. Because Miller addresses only those counts pertaining to thermopane glass, we limit our analysis to those counts listed above