UNITED STATES of America,
Plaintiff-Appellee,

v.

Katherine J. SEGALL, a/k/a: Katherine
J. Coady, Defendant-Appellant.

No. 87–5017.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 10, 1987.

Decided Nov. 23, 1987.

Luke McKissack, Hollywood, Cal., for defendant-appellant.

William Braniff, Asst. U.S. Atty., Criminal Div., San Diego, Cal., for plaintiff-appellee.

Before NELSON, HALL and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Katherine J. Segall appeals her conviction on three counts of making false statements in a matter within the jurisdiction of the United States Customs Service in violation of 18 U.S.C. § 1001.[1] We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

---

1. Section 1001 provides:
   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
   18 U.S.C. § 1001.

## FACTS AND PROCEEDINGS

Segall was a customs broker in San Diego, California, licensed under 19 C.F.R. § 111 to transact business on behalf of importers. During 1983 and 1984, Segall imported cement into the United States from Mexico for Cementos De Guadalajara, S.A., a Mexican corporation. The United States Department of Commerce made a preliminary determination that the price of the cement was being subsidized, and imposed $164,839.27 in countervailing duties upon Cementos to offset the subsidies. Cementos paid the duties to the United States Customs Service through Segall, its broker.

In December 1985, the International Trade Administration of the Department of Commerce determined that Cementos was entitled to a refund of the countervailing duties. On February 28, 1986, Customs liquidated the applicable Cementos entries that had been assessed duties and directed that 680 separate refund checks, totaling $173,386.78, be sent to Segall, the importer of record. Two weeks previously, Cementos had notified Segall by letter that it was expecting the refund and had instructed Segall to forward the checks to its new Customs broker, AM–MEX International.[2]

In April 1986, Cementos complained to the Customs Service in San Diego that it had not received any information from Segall about the refunds. On May 12, 1986, Customs agents visited Segall's office in San Diego to inspect Segall's books on behalf of Cementos pursuant to 19 C.F.R. § 111.27. The agents told Segall the purpose of their visit was to ascertain whether, and when, Segall had received the refund checks from the Customs Service. At this meeting Segall told the agents that she believed she had ninety days to make an accounting to Cementos. The agents then referred her to 19 C.F.R. § 111.29 which requires the broker to account for funds received for the client from the Government within sixty days of receipt. When the agents asked Segall when she had started receiving the checks, she replied "two or three weeks" before the May 12 meeting. The agents then asked to inspect Segall's records relating to the Cementos transactions. Segall told the agents that the records were unavailable because they were in storage or out-of-date.

The agents then inquired how Segall kept track of the refund checks she had been receiving for Cementos. Segall showed the agents a copy of the Customs Notice of Liquidation Bulletin, which listed the Cementos entries that had been liquidated. Segall told the agents that she placed a check-mark next to the entry when she received a refund check. The marked entries indicated that Segall had received $6,910.30 in refunds, which Segall stated was all the refunds she had received to that point. The agents reminded Segall of her record-keeping obligations under the Customs regulations. *See generally, e.g.,* 19 C.F.R. § 111.22–.25 (1986). She requested two or three weeks to prepare her records and an accounting for Cementos.

On June 3, 1986, Customs agents again visited Segall and asked her to provide the records requested on May 12. When Segall responded that she didn't know which records were required, the agents produced a summons specifying the documents. Segall then asked one of the agents what the problem was, and the agent replied that Customs records showed that Segall had

---

**2.** This letter, dated February 14, 1986, provides in pertinent part: "Dear Mrs. Segall: the International Trade Administration has indicated that it has instructed the U.S. Customs Service to assess no countervailing duties on shipments of cement from Cementos.... Accordingly, entries made from July 8, 1983, to September 21, 1983, will be liquidated in due course, with refunds of countervailing duties deposited, without interest; and entries made from September 22 to December 31, 1983, will be liquidated in due course with refunds of countervailing duties deposited with interest.

U.S. Customs Service in San Ysidro has advised us that liquidations and refunds are being processed. Therefore during the period above mentioned you deposited on our behalf and we paid you a hundred and sixty-four thousand eight hundred and thirty-nine dollars and twenty-four cents.

It is our desire that you are hereby instructed to make the refund checks payable to Cementos ... and forward said checks to AM–MEX International...."

received $173,000 in refunds on behalf of Cementos, but had not disbursed the funds. At that point, Segall stated that she had "received very little of the refunded duties."

The government later discovered that between March 6, 1986 and March 19, 1986, Segall endorsed and deposited the 680 checks, totaling over $173,000, into her bank accounts in Gardena and San Diego, California. On July 31, 1986, a federal grand jury indicted Segall, charging her with three counts of violating 18 U.S.C. § 1001 based on her false statements made to the Customs agents on May 12, 1986, and June 3, 1986. After a jury trial, Segall was found guilty on all three counts and was sentenced to three years imprisonment to be followed by five years probation.

## DISCUSSION

On appeal, Segall raises two issues. First, she argues that the section 1001 counts are multiplicitous because one false statement is artificially divided into three counts. Second, she contends that the trial court abused its discretion in permitting the prosecution to elicit evidence that Segall had withdrawn refund monies from her bank accounts.[3]

### A. *Multiplicity*

"Multiplicity is the charging of a single offense in more than one count." *United States v. Israelski*, 597 F.2d 22, 24 (2d Cir.1979). "There is 'no bright line ... dividing charges comprising a single offense from those comprising separate and distinct offenses.'" *United States v. Kennedy*, 726 F.2d 546, 547 (9th Cir.1984) (quoting *United States v. UCO Oil Co.*, 546 F.2d 833, 835 (9th Cir.1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977)).

In the present case, the first two counts of the indictment charge Segall with making false statements on May 12, 1986. Count One charges that she lied when she told the agents that she had only started receiving the refund checks two or three weeks prior to the May 12 meeting. Count Two charges that she lied when she told the agents that she had only received $6,910.30 in refunds as of May 12. The third count charges that Segall lied on June 3, 1986, when she informed the Customs agents that as of June 3 she had received "very little" of the $173,000 in refunds. Segall contends that the three statements are not distinct but are repeated iterations of the initial assertion. We disagree.

Although "where identical false statements ... are made in response to identical questions, the declarant may be convicted only once", *United States v. Olsowy*, 819 F.2d 930, 935 (9th Cir.1987), we have previously held that each nonidentical false statement made or document prepared or used may be charged as a separate violation of section 1001. *UCO Oil Co.*, 546 F.2d at 839; *see also United States v. Bennett*, 702 F.2d 833, 835 (9th Cir.1983) (upholding multiple convictions for submitting subsequent documents summarizing earlier false statements).

■ The government argues that each of Segall's statements were separate lies that hindered the Customs Service in carrying out its regulatory responsibilities. *See Gebhard v. United States*, 422 F.2d 281, 289 (9th Cir.1970) (Although we found the counts multiplicitous, we stated "[i]f [the accused] in fact told separate lies, each of which could have hindered the grand jury in its investigation, then he could properly be separately charged for each lie."). On May 12, Segall told the agents that she had only started receiving the refund checks

**3.** At oral argument, Segall abandoned an "exculpatory no" defense she had asserted in the district court and on appeal. The "exculpatory no" doctrine is an exception to criminal liability under 18 U.S.C. § 1001. It permits a person to make a false statement denying involvement in a crime without incurring additional criminal penalties, provided certain requirements are met. *United States v. Medina de Perez*, 799 F.2d 540, 546 (9th Cir.1986). One of the requirements is that the statement must not be the type that impairs or perverts an investigative agency's functions. *Id.* Here, Segall's false statements plainly impaired Customs' ability to investigate the complaint by Cementos. Thus, as the district court held, the "exculpatory no" doctrine is not applicable.

two or three weeks previously. According to the government, this false statement effectively delayed the running of the sixty-day period for accounting for the refunds, and, as a result, Customs gave Segall additional time to comply with the record-keeping requirements of 19 C.F.R. § 111.22. The second false statement allegedly was also made on May 12 when Segall informed the agents that the total refunds received to that point was $6,910.30. The significance of this statement to the government was the indication that some administrative glitch prevented the 680 checks from reaching Segall within a reasonable time after they had been mailed on March 3, 1986.

We believe that the false statement concerning when the checks began coming in is separate and distinct from the false statement concerning the amount received. An offense is separate and distinct when conviction under one count "requires proof of a fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *United States v. Kennedy,* 726 F.2d 546, 547–48 (1984). Here, proof of Segall's receipt of all the checks in March would establish the falsity of her statement on May 12 that she had only started receiving the checks two to three weeks previously; whereas, proof of the total amount of checks deposited to her individual bank accounts prior to May 12 would show that she lied when she stated the total amount of refunds received to that date was only $6,910.30.

Count three involves statements made at the meeting on June 3, 1986, when Segall told the Customs agents that she had received very little of the refunded duties. Segall argues that this was the same statement involving the same subject matter and the same denial as the statements made on May 12th. She contends that on June 3rd she simply repeated that substantial sums of money had not been received. The government argues, however, that the June 3rd denial was not merely a repetition of the May 12th statements, but was a further assertion that even after three additional weeks had passed, during which

time it would be reasonable to expect that the bulk of the checks would have been received, still very few of the 680 checks that Customs had mailed March 3rd had arrived. We agree with the government.

On May 12th, Segall informed the Customs agents that she had *started* receiving the checks two to three weeks previously and that the total received so far was $6,910.20. By these statements, Segall created the impression that whatever the problem had been, the checks were now coming in and had been for the last two to three weeks. Based upon these May 12th statements, it was reasonable for the Customs agents to assume that the checks would continue to arrive, and that by the next meeting on June 3rd, Segall probably would have received most of them. At the meeting on June 3rd, however, Segall stated that "very little" of the $173,000 in refund checks had arrived. This statement at the June 3rd meeting did not merely repeat the May 12th falsehoods. The June 3rd statement was made against the backdrop of the illusion which Segall created on May 12th that whatever problem had prevented her earlier receipt of the checks had been corrected and the checks were then coming in. The June 3rd statement was a new representation that the situation had changed and the checks were not coming in as expected. This representation was plainly made for the purpose of further misleading the Customs agents and impairing their continuing investigation. The agents were indeed misled and their investigation was impaired. After the June 3rd meeting they pursued further inquiries into the mystery of the "missing" checks. They contacted the Customs Financial Management Center in Indiana in an attempt to find out if the checks had been cashed. They were informed, however, that that office did not keep records from which this could be determined, and that it would take at least eight weeks to retrieve copies of the checks that had been issued to Segall.

Although the multiplicity doctrine is often difficult to apply, *see, e.g., Israelski,* 597 F.2d at 24, we conclude that the false

statements made by Segall on May 12th and June 3rd support her conviction on each of the three separate counts.

## B. *Admission of Testimony*

■ Segall argues that the district court erred in permitting redirect examination of a witness to elicit testimony that Segall had withdrawn funds from her bank accounts. A trial court's evidentiary rulings will not be disturbed on appeal absent a showing of abuse of discretion. *United States v. Burreson*, 643 F.2d 1344, 1349 (9th Cir.), *cert. denied*, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981).

In its direct examination, the government presented testimony that in March 1986 all 680 refund checks had been deposited in Segall's two bank accounts, which had been recently opened. On cross-examination, Segall's attorney attempted to create the impression that all the funds remained in the account through June 9, 1986. On redirect, the government was allowed to elicit testimony that by May 12, 1986, only $2,000 remained in the bank accounts. The district court did not abuse its discretion in admitting this testimony on redirect examination. Segall's attorney "opened the door" to the testimony by introducing on cross-examination evidence which created the false impression that Segall retained the entire $173,000 in her bank accounts until June 9, 1986. *See Burgess v. Premier Corp.*, 727 F.2d 826, 834 (9th Cir.1984). The testimony on redirect was also admissible to remove any unfair prejudice which might have resulted from the evidence Segall introduced on cross-examination. *See London v. Standard Oil Co. of California*, 417 F.2d 820, 825 (9th Cir.1969).

AFFIRMED.