UNITED STATES of America

v.

Duane R. CLARRIDGE.

Crim. No. 91–0665 (HHG).

United States District Court,
District of Columbia.

Dec. 10, 1992.

Kenneth J. Parsigian, Associate Counsel, Office of Independent Counsel, Washington, DC, for U.S.

William Alden McDaniel, Jr., Jo Bennett Marsh, Baltimore, MD, for Clarridge.

## OPINION

HAROLD H. GREENE, District Judge.

### I

#### *Background*

On November 26, 1991 a Grand Jury returned a seven count indictment against Duane "Dewey" Clarridge. At all times relevant to the conduct alleged in this indictment, Mr. Clarridge was a senior officer at the Central Intelligence Agency. From October 1984 to February 1986, Mr. Clarridge held the position of Chief of the European Division in the CIA's Directorate of Operations.

The charges arise out of the covert sale in 1985 of military equipment to Iran. It was widely believed that these weapons were being traded in return for the release of American hostages in Lebanon. Charges have also been made that proceeds from these sales were illegally diverted to the Nicaraguan Contras in violation of United States law. These events are commonly referred to as the Iran–Contra affair.

For the purposes of the charges levied against Mr. Clarridge, this Court need not concern itself, at least at this time, with the alleged diversion of funds to the Contras. The charges in this case only pertain to the shipment of military equipment to Iran.

In the fall of 1986, as media reports of an arms for hostages initiative with Iran surfaced, a number of congressional commit-

tees and the Tower Commission[1] began to investigate this burgeoning scandal. The charges contained in this indictment relate solely to Mr. Clarridge's conduct during the course of these investigations and not the underlying events which make up the Iran–Contra affair.

As previously noted, Mr. Clarridge has been indicted on seven counts—five counts of perjury in violation of 18 U.S.C. § 1621 and two counts of false statements under 18 U.S.C. § 1001. Six of these seven counts are the product of testimony he gave either to a congressional committee or its staff. The other count, Count V, arises from his testimony before the Tower Commission, established by President Reagan to investigate the Iran–Contra affair.

The first three of these seven counts arise from Mr. Clarridge's testimony before the Senate Select Committee on Intelligence on December 2, 1986. Count IV arises from Mr. Clarridge's testimony on December 11, 1986 before the House Permanent Select Committee on Intelligence. The conduct underlying Count V is testimony before the Tower Commission given on December 18, 1986. Count VI alleges that Mr. Clarridge perjured himself on August 4, 1987 during his testimony before a joint session of the House Select Committee to Investigate Covert Arms Transactions with Iran and the Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Opposition (hereinafter the Iran–Contra Committees). And Count VII charges that on April 27, 1987, Mr. Clarridge made false statements before staff members of the House Select Committee to Investigate Covert Arms Transactions with Iran.

In all the counts, the fundamental basis of the perjury or false statement charge is that Mr. Clarridge lied about when he first learned that the United States was shipping arms to Iran.

The government alleges in its indictment that the first shipment of Israeli weapons occurred in August or September of 1985. At this time, Lt. Col. Oliver North was assigned to monitor this initiative. A second shipment of weapons, specifically Hawk missiles, was planned for November 1985.

As the scheduled date for this shipment approached, the Israeli government enlisted the help of Mr. North in overcoming operational difficulties it was experiencing. On November 19, 1985, Mr. North met with Duane Clarridge and Vincent Cannistraro to discuss the problems the Israelis had encountered with this second shipment. This meeting allegedly took place at Charley's Place, a restaurant in McLean, Virginia.

At that meeting, according to the government, Mr. North stated that he was having trouble obtaining flight clearances in Europe for an aircraft traveling to Iran. And it is said that Mr. Cannistraro and Clarridge were told by Mr. North that this aircraft contained military equipment.

The government alleges that beginning on November 21, 1985 Mr. Clarridge became actively involved in assisting North with this flight. Specifically, the government charges that Mr. Clarridge made available a CIA proprietary plane to be used for these shipments. The government also states that North used Mr. Clarridge's office to coordinate the shipment of Hawk missiles to Iran on this plane.

Mr. Clarridge, through counsel, has submitted eight substantive pretrial motions which pursue a wide variety of legal challenges to all or parts of the indictment.[2] Oral argument was heard on several of these motions on October 26, 1992. This Opinion addresses, in turn, all of these outstanding motions in this case.[3]

---

1. This was an Executive Branch commission headed by former Secretary of Defense John Tower. It is also known as the Special Review Board.

2. A number of the counts of the indictment are challenged by several motions.

3. Additional motions have been filed since the Court heard oral argument on October 26, 1992. These motions are not addressed herein.

As will be seen below, the Court grants in part the Motion to Require Election Because of Multiplicity (with the effect that two counts will have to be dismissed); it holds in abeyance its decision with respect to the Motion to Dismiss Counts VI and VII which claim a lack of a proper legislative purpose; and it denies the remaining motions.

## II

### Jurisdiction of Independent Counsel

■ Defendant's motion to dismiss all seven counts of this indictment for lack of prosecutorial jurisdiction is based on two separate arguments. First, the defendant claims that the functions of the Independent Counsel were not performed by Lawrence Walsh, the designated Independent Counsel, but by Craig A. Gillen, one of his subordinates. Second, it is asserted that Title VI of the Ethics in Government Act violates the Appointments Clause of the Constitution, in that the Special Division of the Court of Appeals which appoints independent counsel is not a "Court of Law" within the meaning of Article II § 2 of the Constitution. There is no merit to either of these contentions.

There is no competent evidence whatever to support the argument that Mr. Gillen, rather than Judge Walsh, performed the functions of independent counsel in this case. The only "evidence" provided with respect to this matter is an article in a legal periodical suggesting that "for months now, Gillen, 40, has been in charge of all facets of the independent counsel's office...." Daniel Klaidman and Ann Wolmer, *Craig Gillen Takes the Stage in Iran–Contra*, Legal Times, June 22, 1992, 1. The Independent Counsel's office advised the Court through its pleadings that although Judge Walsh delegates particular tasks to various employees, he made the

decision to seek an indictment of the defendant and he also signed that indictment.[4] *See* Government's Opposition to Defendant's Motion to Dismiss for Lack of Lawful Jurisdiction, at 3.

■ Mr. Clarridge's second argument is similarly devoid of merit. As indicated, the defendant asserts that the Special Division of the Court of Appeals for the District of Columbia is not a "Court of Law" within the meaning of the Appointments Clause of the Constitution, Art. II § 2, cl. 2.

The Special Division which appointed Mr. Walsh as the independent counsel was properly comprised of three Article III judges. But the defendant argues that, in spite of this status, this "division has no operational or functional relationship to the Court of Appeals." Defendant's Motion to Dismiss for Lack of Lawful Jurisdiction at 6.

The Supreme Court's decision in *Morrison v. Olson*, 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), negates the thrust of the defendant's argument. In that case, the Supreme Court upheld the appointment of an independent counsel by the Special Division. This conclusion was based in part on the Court's determination that the Special Division was a "court of law." That, of course, is the precedent which this Court must follow.[5]

Defendant's contention that *Freytag v. Commissioner*, — U.S. ——, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), overruled this aspect of *Morrison* is mistaken. In *Freytag*, the Supreme Court dealt with the question of what circumstances would render an Article I court a "Court of Law." The Special Division of the Court of Appeals is part of an Article III court, and is therefore not affected by *Freytag*.

The motion will be denied.

---

4. In fact the *Legal Times* article submitted by the defense recognizes that Judge Walsh is in regular contact with Mr. Gillen and retains ultimate authority over indictments and plea bargains.

5. In the prosecution of Oliver North, the defendant presented the same argument to Judge

Gesell that Clarridge presents here. *United States v. North*, 708 F.Supp. 387 (1988). Judge Gesell concluded that "in view of *Morrison*" the argument of the defense that the Special Division was not a court of law was "unavailable." *Id.*

## III

### *Multiplicity*

The most meritorious of the defendant's challenges to the charges is his motion to require the government to elect between several counts charged because of multiplicity. In fact, that motion is well taken, at least in part, and for the reasons set forth below, the government is ordered to elect between Counts I and II as well as between Counts VI and VII of the indictment. The motion to require election between other counts is denied.

■ The law protects an individual against multiplicitous indictments to avoid multiple sentences for a single offense and to eliminate the prejudice which such indictments may generate in the eyes of a jury. *See* 1 C. Wright, *Federal Practice and Procedure 2d: Criminal* § 142 at 475–76 (1982). For when an indictment charges numerous offenses arising from the same conduct it "may falsely suggest to a jury that a defendant has committed not one but several crimes." *United States v. Duncan,* 850 F.2d 1104, 1108 n. 4 (6th Cir.1988); *see also, United States v. Marquardt,* 786 F.2d 771, 778 (7th Cir.1986) (multiple indictments create the impression of more criminal activity than in fact occurred) (citations omitted).

Once such a message is conveyed to the jury, the risk increases that the jury will be diverted from a careful analysis of the conduct at issue. Compromise verdicts or assumptions that, with so many charges pending the defendant must be guilty on at least some of them, pose significant threats to the proper functioning of the jury system.

■ The Supreme Court's "same elements" test set forth in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), for determining whether subsequent prosecutions for the same conduct are barred by the Double Jeopardy clause is also used, with some modifications, for determining whether an indictment is multiplicitous. *See United States v. Doulin,* 538 F.2d 466, 471 (2d Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178 (1976); *United States v. Tedder,* 801 F.2d 1437, 1446 (4th Cir.1986), *cert. denied,* 480 U.S. 938, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987).

Under *Blockburger,* the "test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger, supra,* 284 U.S. at 304, 52 S.Ct. at 182. Nevertheless, in the context of multiplicity challenges, the simplicity of this approach causes problems, and it has therefore been significantly altered. 1 C. Wright, *Federal Practice and Procedure 2d: Criminal* § 142 at 476 (1982). The more precise and useful inquiry is whether the legislature intended multiple punishments for the conduct contained in an indictment. *Id.* at 477–78.[6]

In attempting to answer this inquiry Courts of Appeals confronted with allegedly multiplicitous perjury indictments have adopted variations on the *Blockburger* approach. These courts have stated that under the multiplicity doctrine "it is improper for the government [to] bludgeon a witness who is lying by repeating and rephrasing the same question." *United States v. Williams,* 552 F.2d 226, 228 (8th Cir.1977), *citing Gebhard v. United States,* 422 F.2d 281, 289–90 (9th Cir.1970).

This is so because a "[s]ingle punishment for a single lie should suffice." *Gebhard, supra,* 422 F.2d at 290; *see also, Doulin, supra,* 538 F.2d at 471, and only false statements which are "separate, distinct and unrelated" are appropriately charged as separate counts. *United States v. De la Torre,* 634 F.2d 792, 794 (5th Cir.1981).

Unfortunately, there is "no bright line" dividing "a single offense from those comprising separate and distinct offenses." *United States v. Segall,* 833 F.2d 144, 146

---

6. In trying to determine congressional intent, the Supreme Court has noted in a similar context that a court should "resolve any ambiguity in favor of lenity when required to determine the intent of Congress in punishing multiple aspects of the same criminal act." *Heflin v. United States,* 358 U.S. 415, 419, 79 S.Ct. 451, 453, 3 L.Ed.2d 407 (1959).

(9th Cir.1987). Perhaps for this reason, the Ninth Circuit, faced with arguably multiplicitous perjury counts, acknowledged that "the multiplicity doctrine is often difficult to apply." *Id.* at 147.

Some Circuits have adopted a second criterion to assist in determining whether perjury or false statement charges are multiplicitous: two counts of perjury are separate offenses and not multiplicitous if (1) they allege different lies and (2) the second false statement further impaired the operations of the body before which the statement was made. *United States v. Salas–Camacho,* 859 F.2d 788, 791 (9th Cir.1988). *See also, United States v. Hubbard,* 474 F.Supp. 90, 98 (D.D.C.1979), *aff'd on other grounds,* 668 F.2d 1238 (D.C.Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982).[7]

■ The precedents do not formulate a precise and exhaustive formula for determining whether perjury and false statement allegations are multiplicitous. However, in the view of this Court, the appropriate test is this: each count must set forth a separate lie or false statement, and in cases where the facts present a close question of whether separate lies exist, it is relevant to inquire into the degree to which the second statement impaired the body before which it was made.

## A. Testimony Before Different Legislative Committees

■ With these principles in mind, the Court will first address the defendant's argument that separate Counts arising out of appearances before separate committees of Congress are multiplicitous. The Court concludes, as a matter of law, that Mr. Clarridge's testimony before different committees of the Congress on different dates cannot, under any interpretation, constitute the "same" offense for multiplicity purposes.

Even if the defendant was allegedly repeating the exact same lies before these different committees, which Mr. Clarridge appears to be accused of doing, the indictment would not be multiplicitous. The defendant's conduct is only one element of the perjury charge. The government must also prove that each committee was a competent tribunal, that the testimony was material to those proceedings, and that the oath was properly administered. With regard to the Counts arising out of appearances before different committees, each requires proof of several facts which the others do not. *Cf. Blockburger, supra,* 284 U.S. at 304, 52 S.Ct. at 182.

Moreover, these congressional committees are comprised of different sets of Representatives or Senators. They and their committees may be presumed to have had separate motivations for calling Mr. Clarridge before them to testify. Since he appeared before each committee on different dates, during a rapidly unfolding scandal, the state of each committees' knowledge at the time Mr. Clarridge testified necessarily varied. Not surprisingly, the defense has failed to offer one precedent holding that lies told before separate bodies could be considered the same offense.[8]

In addition to the lack of legal authority, the logical underpinning of the defendant's argument presents serious public policy problems. By asking this Court to find counts involving separate committees to be multiplicitous, the defense would place a premium on consistent perjury. Under de-

---

7. This "impairment to government operations" criterion of the multiplicity analysis was first articulated by the Ninth Circuit in *Gebhard,* where the court stated that only "separate lies, each of which could have hindered the grand jury in its investigation" constitute separate offenses. *Gebhard, supra,* 422 F.2d at 289. Both the Eighth and Ninth Circuits have extended the *Gebhard* analysis of multiplicitous perjury charges to allegedly false statements made in violation of 18 U.S.C. § 1001. *United States v. Trent,* 949 F.2d 998, 999–1000 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3005, 120

L.Ed.2d 880 (1992); *Segall, supra,* 833 F.2d at 146–48.

8. The Tower Commission, established by President Reagan as part of the Executive Branch, presents an even less compelling case for multiplicity. No members of the Legislative Branch served on the Tower Board, and the commission undeniably had independent and legitimate grounds for questioning Mr. Clarridge and all other individuals with relevant information.

fendant's theory, once an individual tells a lie before any committee of either branch of Congress, successive retelling of that lie before any other congressional committee, even months apart, and in the context of a different inquiry, could not be punished. Moreover, different committees, perhaps even of different branches of the legislature (*i.e.*, the House and the Senate), are clearly entitled to conduct their separate inquiries, unobstructed by false statements.

It is for reasons such as these that the novel approach advanced by the defendant is unsupported by precedent, public policy, or common sense.[9] The Court denies the claim that counts alleging perjury before different committees are multiplicitous and Count IV alleging perjury before the House Permanent Select Committee on Intelligence, Count V arising from testimony in front of the Tower Commission, and Counts VI and VII arising from appearances before the Iran/Contra Select Committees will therefore not be dismissed on the ground that they are multiplicitous with Counts I–III.

### B. Counts Arising From Conduct Before One Committee

The situation is different where only a single congressional committee is involved. Several of the counts raised in the indictment here arise from testimony given to a single committee. Specifically, Counts I, II, and III all stem from one day of Mr. Clarridge's testimony before the Senate Select Committee on Intelligence. Similarly, Counts VI and VII arise from testimony (1) before a full session of the Senate and House Iran–Contra Committees, and (2) an earlier deposition taken by staff members of the same committees. Defendant's

claims with respect to these several matters must be considered separately.

### C. Counts I and II

■ The indictment specifically alleges that Mr. Clarridge had a conversation with Lt. Col. Oliver North in a bar on November 19, 1985, where Mr. North informed him about a pending shipment of Hawk missiles to Iran. It is the government's position that North solicited Mr. Clarridge's assistance and access to CIA resources in overcoming logistical difficulties he was experiencing with the arms shipment to Iran.

According to the first count of the indictment, Mr. Clarridge lied to the Senate Select Committee on Intelligence when he testified in response to questions that he did not learn of the military cargo aboard this flight until January 1986. Given the November 19, 1985 meeting between North and Clarridge, the government is charging that this response constituted perjury.

The second count of the indictment is based on questions posed to Mr. Clarridge during the same session by another member of this same Senate Select Committee about the cargo of this flight. The government claims that Count II charges a separate offense because it alleges that Mr. Clarridge lied when he said that Mr. North did not know at this time about the plane's true cargo, rather than merely that *he himself* did not know about that subject. *See* Government's Opposition to Defendant's Motion to Require Election Because of Multiplicity at 6. In the opinion of the Court, notwithstanding outward appearances, Mr. Clarridge is actually being charged with two offenses for telling the same alleged lie, before the same body, on the same date, for the following reasons.[10]

---

**9.** It is perhaps on this basis that Mr. Clarridge's counsel conceded at oral argument that the Counts alleging perjury before separate committees presented the weakest claims for multiplicity. *See* Transcript of October 26, 1992 Motions Hearing at 31.

**10.** Count I is based on the following exchange:
Mr. Newsom: At what point did you become, did you have knowledge that the cargo of the plane was actually weapons?

Mr. Clarridge: Well, as I say, the trouble is that when I really got a fix on it was in January when Charlie Allen debriefed a—the Iranian go-between in all this. OK.
Count II is based on the following exchange:
Senator Specter: Well, but North—Colonel North never told you that there was a military equipment involved.
Mr. Clarridge: Well, that's a different issue. That's a different issue.

The questions by a staff member which form the basis of Count I were directed at what Mr. Clarridge learned from North. As for Count II, the focus of Senator Specter's inquiry was the same—what Clarridge learned from North. It was Mr. Clarridge's own response that raised the issue of the extent of Colonel North's knowledge.

Except literally, the inquiries in Count I and II are really the same, and the government is artificially multiplying the charges by incorporating them in two counts rather than one. Separate counts are only appropriate where the "inquiries [are] directed to a separate facet of the overall transaction being investigated." *Doulin, supra,* 538 F.2d at 471. The questions here are directed at the very same "facet" of the committee's inquiry—namely when did Mr. Clarridge learned from Mr. North (who already knew) that military equipment was being shipped to Iran? [11]

The only arguable difference is that the first question asks Mr. Clarridge about his knowledge without a limitation on the source of that information (although the committee as well as the grand jury knew, or must have known that North was that source), while the second query more specifically charges falsity as to what North told him about that flight. This facial distinction between the two questions does not overcome the fundamental identity of the inquiries.

The Court concludes that the government is improperly attempting to transform Mr. Clarridge's alleged perjury about his meeting with Mr. North on November 19, 1985 into two lies and two perjury counts. The government claims that Mr. Clarridge's statements in Count I were false because he had already been told about the arms shipment by Oliver North on November 19, 1985 at Charley's Restaurant. Count II then charges perjury because Mr. Clarridge denied that North told him about the shipment in the same conversation. In other words, the purported falsity in each count is established solely by proof of the November 19, 1985 discussion with Colonel North. [12]

In this case, it would be plainly inconsistent for the jury to find that when Mr. Clarridge testified before the Senate Select Committee on December 2, 1986, he perjured himself in response to the questions in Count I, but did not commit perjury with respect to the questions posed in Count II. These statements were given pursuant to one oath, they were made before the same committee on December 2, 1986, and they pertained to identical subject matter. Moreover, the government will attempt to prove their falsity by the same conduct, the November 19, 1985 meeting between North and Clarridge and the identical conversation. Inconsistent verdicts on these two counts would present an unexplainable contradiction. *Cf. Marzani, supra,* 71 F.Supp. at 618. This Court accordingly holds that if Mr. Clarridge lied to the Senate Select Committee about the conversation with Mr. North regarding the flights in question, he

Senator Specter: You're talking about a different issue on a different flight?

Mr. Clarridge: On a different flight.

Senator Specter: Had he ever told you about the military equipment being on the—

Mr. Clarridge:—flight from Tel Aviv to Tabriz?

Senator Specter: Yes.

Mr. Clarridge: No, and I can't say that he knew. I can't say for sure that he knew.

11. The government, in its papers and at oral argument, stresses that the facts alleged in the indictment do not limit it from proving the charges by other evidence. Even if the government could prove the falsity of Counts I and II by separate evidence, this does not necessarily mean that separate counts exist. *Blockburger*

does not hold that separate offenses exist if additional facts *could* possibly be established to prove each charge, but that the offenses are distinct if they require proof of an additional fact.

12. These two counts are thus not separate offenses if only because the government does not need to prove an additional fact to establish perjury on both counts. *See Blockburger, supra,* 284 U.S. at 304, 52 S.Ct. at 182; *United States v. Marzani,* 71 F.Supp. 615, 618 (D.D.C.1947), aff'd, 168 F.2d 133 (D.C.Cir.), aff'd, 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431 (1948); *United States v. Berardi,* 629 F.2d 723, 729 (2d Cir.1980); and *United States v. Tyrone,* 451 F.2d 16, 18 (9th Cir.1971), *cert. denied,* 405 U.S. 1075, 92 S.Ct. 1494, 31 L.Ed.2d 808 (1972).

may be indicted and convicted of having done so—but only once, not twice.

### D. Count III

Count III of the indictment, which also arises from testimony before the Senate Select Committee on Intelligence, is in a different category and the Court finds it not to be multiplicitous. The statements of Mr. Clarridge which comprise Count III are similar in some respects to those in the first two counts, but they are directed at other specific events and constitute separate alleged lies from those charged in Counts I and II.

In the questions contained in Count III Mr. Clarridge was asked whether the use of CIA proprietary aircraft to fly a mission to Iran tipped him off that sensitive materials might be involved. He was also asked whether Colonel North's presence in Mr. Clarridge's office aroused his suspicion that more than a strictly commercial flight was involved. Mr. Clarridge responded negatively to both these questions.

By contrast with Counts I and II, the subject matter of Count III is directed at Mr. Clarridge's reactions to specific events which occurred after his initial meeting with Colonel North. The alleged false statements in Count III are not so closely related to the first two Counts that they could properly be characterized as the same lie. Moreover, by supplying the committee with allegedly false information about these specific events the defendant arguably impaired the committee's investigations to a greater degree than did his responses relayed in the first two counts. *See Gebhard, supra,* 422 F.2d at 289.

For these reasons the Court concludes that the charges contained in Count III are not multiplicitous with the charges contained in Counts I and II, and that Count will not be dismissed.

### E. Identical Answers to Personnel From the Same Committee

■ Counts VI and VII which both involve conduct before the Iran–Contra select committees presents a different and more difficult application of the multiplicity doctrine.

In these two counts, the defendant is charged with two separate crimes, perjury and false statements, for giving basically the same answers to essentially identical questions. Mr. Clarridge's alleged lies which make up the false statements charge were given during his April 27, 1987 deposition conducted by the committee staff. This testimony was based on several questions posed either by Neil Eggleston and Paul Barbadoro, counsel for the House and Senate Iran–Contra committees respectively. Mr. Eggleston was present for all of Mr. Clarridge's answers which comprise Count VII.

The August 4, 1987 testimony by Mr. Clarridge, which is the basis of Count VII, occurred before a joint session of the House and Senate Iran–Contra committees. This testimony, made in response, once again to questions posed by Neil Eggleston, covered the very same subject matter—Clarridge's knowledge of arms shipments to Iran—as the April 27, 1987 testimony.

Through this indictment the government seeks to charge as two separate criminal offenses very similar statements made in response to questions by one individual who was asking nearly identical questions in the same official capacity. Although these statements occurred three months apart, Mr. Eggleston and Mr. Barbadoro were acting as agents of the two select committees both at the April 27, 1987 deposition, and at the August 4, 1987 committee hearing.

The Court concludes that Mr. Clarridge is being charged with separate offenses for the same conduct.

It is true that some courts have held that the telling of the same lies in one proceeding but on different occasions constitutes separate offenses. *See United States v. Guariglia,* 757 F.Supp. 259 (S.D.N.Y.1991). However, in *Guariglia* the defendant perjured himself once during direct examination and once on cross-examination, and the court, in determining that the defendant had not been set up for perjury, found it

significant that different attorneys, pursuing varied agendas, had asked the two questions which formed the separate counts. *Id.* at 264. This fact apparently aided the court's conclusion that the defendant's conduct "arguably ... involved separate decisions" to perjure himself. *Id.*[13] By contrast, Mr. Clarridge, if he did in fact lie, was responding to the same line of questioning by the same person on behalf of the same body on each occasion.

Counts VI and VII also fail the second prong of the multiplicity analysis articulated by some Circuits, in that the repetition of the alleged lie did not further impair the operations of the Iran–Contra committees. *See United States v. Olsowy,* 836 F.2d 439, 443 (9th Cir.1988). In that case, the court had to decide whether the same false statement made to the same secret service agent two weeks apart amounted to one offense. Since the repetition of the "initial false statement did not further impair the operations of the government" the conduct was held to amount to only one offense. *Id.*

By the time he appeared before the joint session of the House and Senate Iran–Contra select committees, the members of these committees knew the exact nature of Mr. Clarridge's prior testimony on this subject. The tone of Mr. Eggleston's cross-examination, like the questioning of Mr. Clarridge in Count VI, reveals a strong confidence in his knowledge of the answers he would receive. Indeed, Mr. Clarridge's prior testimony before other committees about his knowledge of the 1985 missile shipment was a matter of public record. The diligent staff of these select committees undoubtedly had reviewed Mr. Clarridge's prior testimony.

In short, the government has not asserted, and there are no grounds for concluding, that Mr. Clarridge's August 4, 1987 testimony further "impaired" the operations of the select committees. If any-

thing, his testimony confirmed and reinforced the strong assumptions of the staff and members of that committee as to the content of Mr. Clarridge's testimony. And the Court sees no grounds for applying a different test to Mr. Clarridge's situation solely because the allegedly multiplicitous counts involve false statements and perjury respectively.

For these reasons, the government will have to elect whether it will go forward on Count I or on Count II and also whether it will proceed on Count VI or Count VII; it may not go forward with all these counts.

### IV

#### *Legislative Purpose*

The defendant has filed a motion to dismiss both Counts VI and VII also on account of an alleged lack of proper legislative purpose, and he requests an evidentiary hearing as to the legislative purpose underlying Counts IV and V.

For the reasons stated below, the motion for dismissal with respect to what remains of Counts VI and VII for lack of legislative purpose is held in abeyance. This issue is not ripe for final disposition at this time, but the motion for an evidentiary hearing on this issue with respect to Counts IV and V will be denied.

#### A. Legal Principles

The basic theory underlying these motions is that where a legislative committee or a grand jury calls a witness before it for the purpose of establishing or solidifying the basis of a perjury indictment, that tribunal is not competent. The lack of a competent tribunal would of course necessitate dismissal of the charges.

In presenting this motion the defendant relies heavily on two cases from this jurisdiction, *United States v. Cross,* 170 F.Supp. 303 (D.D.C.1959), and *United*

---

**13.** In *Guariglia,* the alleged multiplicitous charges were about the defendant's gambling. The defendant, appearing as a witness in a criminal trial, lied about his gambling activities. In a separate proceeding conducted after the trial to review the defendant's release conditions, the

defendant repeated the same lie. These two statements "impaired the operations of government" in different ways, because the defendant was questioned in the pursuit of different governmental functions.

*States v. Icardi,* 140 F.Supp. 383 (D.D.C. 1956). In *Cross,* the court dismissed a perjury count which arose from the defendant's second round of testimony before the same congressional committee. The committee recalled the defendant after hearing testimony that directly contradicted his initial testimony. The Court dismissed the perjury charges which were based on statements made at the second proceeding because it found that the committee lacked a proper legislative purpose. In reaching this conclusion, the *Cross* court stated that when a:

> committee questions a witness *solely* for the purpose other than to elicit facts in aid of legislation, that committee steps outside its authority and no longer acts as a competent tribunal

*Cross, supra,* 170 F.Supp. at 306 (emphasis added).

With respect to Count IV and V, the defendant seeks an evidentiary hearing to determine whether the sole purpose of the questioning bodies was to establish a firmer basis for a perjury indictment. *Id.* at 309. The defendant's theory is based on the notion that the various legislative committees (and the Tower Commission) which questioned Mr. Clarridge shared the information they accumulated. Mr. Clarridge initially testified on December 2, 1986 before the Senate Select Committee on Intelligence about when he became aware of arms shipments to Iran. Therefore, the defense argues, each subsequent committee (and the Tower Commission) already possessed the relevant information they needed from Mr. Clarridge. The other committees which called on Mr. Clarridge to testify lacked a proper legislative purpose, under the defense's theory, because they knew the answers to their questions.

### B. Hearing on Counts IV and V

■ The Court rejects the defendant's motion for a hearing on this issue with respect to Counts IV and V. Count IV arises from his testimony before the House Permanent Select Committee on Intelligence on December 11, 1986. This was only nine days after his first round of testimony before the Senate Select Committee on Intelligence.

The Supreme Court has recognized the broad investigatory powers conferred on Congress as part of its law-making responsibilities. *Watkins v. United States,* 354 U.S. 178, 187, 77 S.Ct. 1173, 1179, 1 L.Ed.2d 1273 (1957). Even if the members of House committee had access to Mr. Clarridge's testimony before a Senate Committee given just a week earlier, the House of Representatives had the power, the authority, and the duty to investigate this matter separately and independently. At this early stage of the Iran–Contra scandal, it is not conceivable that the sole motivation of the committee was establishing a firmer basis for a perjury indictment. Unlike the committee in *Cross,* it is doubtful that the House Permanent Select Committee knew or even expected that Mr. Clarridge's testimony would be false.

A similar rationale warrants denial of a hearing on the motivation of the Tower Commission in calling Duane Clarridge as a witness. His testimony before the Tower Commission on December 18, 1986 is the basis of Count V. This commission was established by President Reagan to investigate the entire Iran–Contra scandal. The Tower Commission's roots in the executive branch of government alone give it a legitimate purpose for calling Mr. Clarridge as a witness. This characteristic renders the commission a competent tribunal regardless of what its members might have known prior to calling Mr. Clarridge as a witness.

### C. Dismissal of Counts VI and VII

■ As indicated, defendant seeks an outright dismissal of Counts VI and VII on these same grounds. Under the Court's ruling with respect to multiplicity, only one of these Counts will remain at issue. The Court is skeptical that the defendant can meet the *Cross* standard on this issue with respect to that Count.

By August 1987, Iran–Contra had developed into one of the most serious political scandals of the decade, and Congress was under considerable political pressure to

leave no stone unturned in its investigation. This attitude is reflected in that fact that both the House and the Senate created special select committees solely to address this critical issue. The joint sessions of these committees were televised live on national television and the political ramifications of this scandal are still being felt. Given the context in which Mr. Clarridge's testimony occurred, it is doubtful that these committees called Mr. Clarridge for the sole purpose of establishing a firmer basis for a perjury conviction.

Nevertheless, this Court will not rule on this motion at this time. In both *Cross* and *Icardi*, the court decided the question of legislative purpose after the prosecution had presented its case in chief. This procedure allowed the defense to develop through cross-examination, and out of the presence of the jury if necessary, the motivations of the committee members who called on Mr. Clarridge to testify before them. The same procedure is appropriate here. Thus, with respect to the one count which remains of Counts VI and VII, the Court will hold in abeyance its decision on whether the Iran–Contra committees had a proper legislative purpose.

## V

### *Lack of Prosecutorial Jurisdiction*

The defendant has also moved to dismiss four of the seven counts against him on the basis that the Independent Counsel lack prosecutorial jurisdiction to bring these criminal charges. In his reply to the government's opposition to this motion, defendant conceded that proper prosecutorial jurisdiction does exist for Counts IV and V. This means that the motion is pending only

with respect to Counts VI and VII. For the reasons stated below, the Court denies the motion with respect to these counts.

On December 19, 1986 Judge Lawrence Walsh was appointed by a Special Division of the United States Court of Appeals for the District of Columbia as Independent Counsel to investigate the Iran–Contra affair. This appointment was made prior to the 1987 Independent Counsel Reauthorization Act which amended the confines of an independent counsel's jurisdiction. *See* Pub.L. No. 100–191, 101 Stat. 1293, § 6(b)(1), *reprinted in* Historical and Statutory Notes, 28 U.S.C.A. § 591.

The 1987 Act does not apply, except for limited purposes, to independent counsels appointed prior to December 15, 1987, the date upon which the act became effective. Under the controlling statutes in place at the time Judge Walsh was appointed, the Independent Counsel's jurisdiction was defined by the Special Division which appointed him or her, *see* 28 U.S.C.A. § 593, and the Special Division's December 19, 1986 Order therefore controls the scope of the Independent Counsel's jurisdiction, without the limitations the defendant reads into the 1987 version of the law.[14]

The crux of the defendant's argument is that the Special Order limited Judge Walsh's jurisdiction to the prosecution of crimes committed *before* December 19, 1986. The defendant's theory, based as it is on an extremely strained reading of the December 19, 1986 Order by the Special Division[15], is without merit.

It is true that the Special Division's Order uses the past tense to describe Judge Walsh's authority to investigate and prosecute crimes arising out of the Iran–Contra

14. Mr. Clarridge has conceded this point in his reply to the government's opposition.

15. The Special Division's order granted the independent counsel jurisdiction to investigate "whether any person or group of persons ... has committed a violation of any federal criminal law ... *relating in any way* to" the shipment of arms to Iran and the diversion of proceeds to the contras.

The Special Order also states that "the Independent Counsel shall have jurisdiction and authority to investigate other allegations or evidence of violation of any federal criminal law by Oliver L. North, and any person or entity heretofore referred to, developed during the Independent Counsel's investigation referred to above, and connected with or arising out of that investigation, and to seek indictments and to prosecute any persons or entities involved in any of the foregoing events or transactions who are reasonably believed to have committed a violation of any federal criminal law ... arising out of such events ..."

scandal. However, otherwise that order grants extremely broad powers to the Independent Counsel, authorizing Judge Walsh to investigate "violation[s] of any federal criminal law ... relating in any way" to the Iran–Contra scandal. *See* December 19, 1986 Special Order at 1. The Independent Counsel was also given authority to investigate and prosecute any crimes "arising out of" the events surrounding the Iran–Contra scandal. *Id.* It is for these reasons that the three courts which have addressed this specific issue, have each rejected the argument posed by Mr. Clarridge. *See United States v. Weinberger*, Cr. No. 92–0235, slip op. at 5–7, 1992 WL 294877 at *3 (D.D.C. Sept. 29, 1992); *United States v. Clines*, No. R–90–0064, slip op. at 1–4 (D.Md. August 23, 1990); *United States v. Secord*, 725 F.Supp. 563 (D.D.C. 1989).[16]

The defendant has presented no plausible grounds for departing both from the language of the Special Division's Order and the reasonable interpretation which other courts have given to such Orders. Counts VI and VII, which charge Mr. Clarridge with making false statements before Congress or staff members, are within Judge Walsh's prosecutorial jurisdiction.

The motion is denied.

## VI

### *Failure to State an Offense With Respect to Statements to the Tower Commission*

▮ In Count V, the government alleges that Duane Clarridge made false statements to the Tower Commission, in violation of 18 U.S.C. § 1001. That provision provides, in pertinent part:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up ... or makes any false, fictitious or fraudulent statements ... shall be fined not more than $10,000 or imprisoned not more than five years or both.

*Id.*

The defendant asserts that The Special Review Board is not "any department or agency of the United States," and that Count V must therefore be dismissed. Relying on *Brethauer v. United States*, 333 F.2d 302 (8th Cir.1964), he contends that unless Congress expressly designates an entity as an "agency," "commission," or "board," false statements made to that entity do not violate section 1001. Clarridge's theory would require Congress to pass legislation specifically stating that the Tower Commission is a "commission" for the purposes of section 1001. According to that argument, absent such action, any allegedly false statements made to the Tower Commission do not violate the statute.

The argument is specious. First, the plain language of 18 U.S.C. § 6 defines "agency" as "any department, independent establishment, commission, administration, authority, board or bureau of the United States...." Nothing in the law requires a formal act of Congress to create an "commission" for the purposes of section 1001. Therefore, because the Tower Commission, also known as the Special Review Board, falls within section 6's definition of "agency", the prohibitions of section 1001 apply. *See United States v. Fernandez*, Crim. No.

---

**16.** In *United States v. Secord*, 725 F.Supp. 563 (D.D.C.1989), Judge Robinson ruled that the Independent Counsel had jurisdiction to prosecute Secord for alleged perjury before Congress committed after Judge Walsh's appointment since the "congressional investigation itself 'arose from' the events constituting the Iran–Contra initiative." *Secord, supra*, 725 F.Supp. at 564–65. Similarly, Judge Hogan, in *United States v. Weinberger*, Cr. No. 92–0235, slip op. at 5–7, 1992 WL 294877 at *3 (D.D.C. Sept. 29, 1992), rejected arguments that Judge Walsh lacked proper jurisdiction to prosecute Casper Weinberger for false statements made to Congress after December 19, 1986. Judge Hogan found that these alleged criminal acts "arose out of the Iran/Contra scandal," giving the Independent Counsel jurisdiction to prosecute. *See Weinberger*, Cr. No. 92–0235, slip op. at 7, 1992 WL 294877 at *3. Lastly, in *Clines* the court found that Judge Walsh had jurisdiction to prosecute the defendant for failing to report profits received from Iran/Contra activities on his 1987 tax return, which was filed after the independent counsel was appointed. *See United States v. Clines*, No. R–90–0064, slip op. at 1–4 (D.Md. August 23, 1990).

89–150–A, slip op. at 10 (E.D.Va. June 15, 1989).

Second, even under the defendant's reasoning section 1001 is applicable to false statements made to the Tower Commission. In fact, *Brethauer* itself undermines the defense's theory. There, in considering allegations that the defendants made false statements to the Post Exchange, the Court held that section 1001 applied even though there was no act of Congress creating or defining Post Exchanges. It was enough that the Post Exchanges were created by a regulation pursuant to a statutory grant of authority. *Brethauer, supra,* 333 F.2d at 305. "[A]n act of Congress is not in all instances a necessary prerequisite for the establishment of a jurisdiction upon which a criminal prosecution may be lawfully predicated." *Id.*

A similar process created the Tower Commission. Pursuant to a valid statutory authority, *i.e.,* the Federal Advisory Committee Act, 5 U.S.C.App. II, President Reagan signed an administrative regulation, *i.e.* Executive Order 12575, creating the Tower Commission.[17]

Nor is there any difficulty, as the defendant contends, in discerning the Commission's jurisdiction. Executive Order 12575[18] and President Reagan's contemporaneous statements provide a sufficient basis for this Court to determine the boundaries of the Commission's jurisdiction and to ascertain whether the questions posed fell within the jurisdiction conferred. *See* 1986 *Public Papers of the Presidents of the United States* 1587–88, 1591–95.

The Court finds the Tower Commission to be an "agency" for the purposes of 18 U.S.C. § 1001, and the defendant's motion is therefore denied.

## VII

### *Motion to Dismiss Because Statements Literally True*

■ Defendant next moves to dismiss Counts III and VI, and part of Count VII on the ground that they are based on testimony which is literally true. A perjury prosecution cannot be maintained when the answers at issue are literally true, even if those answers are unresponsive or misleading. *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973).

■ As a preliminary matter, Clarridge attacks the sufficiency of the indictment arguing that it lacks a "truth paragraph" adequate to permit a jury to evaluate the verity of the defendant's statements. The crux of each count is the allegation that Clarridge falsely stated that he had not "learned prior to November 24, 1985, that the November 1985 shipment to Iran would contain weapons." Indictment at 9. According to defendant, that indictment is flawed because it fails to allege the source of Mr. Clarridge's knowledge that the November 24 cargo would be weapons. Instead, paragraph 13 alleges that Lt. Colonel North merely told Clarridge that the shipment contained "military equipment." Indictment at 13. This, the defense contends, could range from shoes and tents to oil drilling machinery to Hawk missiles.

■ It is well-established than an indictment is sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against

---

**17.** Executive Order 12575 states:

> By the authority vested in me as President ... and in order to establish. in accordance with the Federal Advisory Committee Act, as amended, ... a Special Review Board to review the activities of the National Security Council, it is hereby ordered as follows:
> Section 1. Establishment. (a) There is established the President's Special Review Board on the future role of the National Security Council staff....

**18.** Pursuant to Executive Order 12575, the Tower Commission had jurisdiction as follows:

> Sec. 2. Functions. (a) The Board shall conduct a comprehensive study of the future role and procedures of the National Security Council (NSC) staff in the development, coordination, oversight, and conduct of foreign and national security policy; review the NSC staff's proper role in operational activities, especially extremely sensitive diplomatic, military, and intelligence missions; and provide recommendations to the President based upon its analysis of the manner in which foreign and national security policies established by the President have been implemented by the NSC staff.

which he must defend." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). The indictment meets this standard. Falsity is an element of both section 1001 and section 1621.

First, the indictment alleges that Clarridge made false statements to the Tower Commission and certain congressional committees. Second, the indictment clearly sets out what portion of Mr. Clarridge's testimony was false. *See* Count I, ¶ 20 ("The above ... statement made ... by defendant ... was false ... in that he learned prior to November 24, 1985, that the November 1985 shipment to Iran would contain weapons."); Count II, ¶ 5 ("The above ... statement made ... by the defendant ... was false ... in that he learned prior to November 24, 1985, that the November 1985 shipment to Iran was part of a United States government initiative toward Iran that involved the transfer of weapons to Iran in an attempt to cause the release of Americans taken hostage in Lebanon."); Count IV, ¶ 5 (same as Count I); Count V, ¶ 5 (same); Count VI, ¶ 5 (same); Count VII, ¶ 5 ("The above ... statements made ... by the defendant ... were false, fictitious and fraudulent ... in that he had learned prior to November 24, 1985 that the November 1985 shipment to Iran would contain weapons, and the NSC was involved in an operation that involved arms and hostages and was supporting a shipment of weapons to Iran."). Moreover, it is the province of the jury to decide whether Mr. Clarridge knew that "military equipment" referred to weapons, as the prosecution asserts, or whether he indeed believed it to be a more innocuous item such as oil drilling equipment, as the defense asserts.[19]

Moving to the more substantive issue—whether Mr. Clarridge's statements were literally true—the Court declines to dismiss Counts III, VI and part of Count VII on this basis. The defendant is correct that the federal perjury statutes do not reach statements which are literally true, even if the speaker's answer was intended to deceive or be unresponsive to the question. *Bronston, supra*, 409 U.S. at 360, 93 S.Ct. at 600–601.

Clarridge dissects each of the alleged perjuries to demonstrate that they are true, albeit unresponsive. Such stretching of the language would be unnecessary were the contested statements literally true. Nor does *Bronston* give a defendant latitude to insulate himself from prosecution by reinterpreting his statements in order to give them a meaning which is literally true. As our Court of Appeals has stated:

> [T]he possibility that a question or answer may have a number of interpretations does not invalidate either an indictment or a conviction after a jury charge which, as here, requires the jury to determine that the question as the defendant understood it was falsely answered in order to convict.

*United States v. Chapin*, 515 F.2d 1274, 1280 (D.C.Cir.1975). *Bronston* requires the court to dismiss the indictment only when it is plain that the government cannot prove that the defendant's statement was false. In situations, as here, where there may be one or more arguable constructions of the defendant's statements under which those statements might be found true, and other constructions that the statements were, the question is left for the jury.

### VIII

### *Exculpatory No Doctrine*

 The defendant next argues that the "exculpatory no" doctrine to 18 U.S.C. § 1001 requires the dismissal of Counts V and VII. The "exculpatory no" doctrine has its roots in the Fifth Amendment and permits a defendant to falsely deny criminal conduct without violating section 1001's prohibition against false statements. While several Circuits have adopted the doctrine, the Court of Appeals for this Circuit has never expressly adopted or reject-

---

**19.** Not that this distinction is especially relevant. In his testimony, Mr. Clarridge did not claim that he believed the shipment mentioned by Oliver North to be military boots. Instead, he stated that he thought that the plane was carrying an entirely commercial shipment.

ed it. *United States v. White,* 887 F.2d 267 (D.C.Cir.1989).[20]

Even if the doctrine had life in this Circuit, it would be inapplicable in the instant case. Applying any of the various tests developed by the other Circuits, Clarridge does not meet the criteria for invocation of the exception.

First. All formulations of the "exculpatory no" doctrine require that the false denial be made in a situation when a truthful answer would have incriminated the defendant. *See, e.g., United States v. Cogdell,* 844 F.2d 179, 183 (4th Cir.1988); *United States v. Bush,* 503 F.2d 813, 818 (5th Cir.1974); *United States v. Taylor,* 907 F.2d 801, 805–06 (8th Cir.1990); *United States v. Medina de Perez,* 799 F.2d 540, 544 (9th Cir.1986); *United States v. Tabor,* 788 F.2d 714, 719 (11th Cir.1986). The purpose of the Tower Commission and the Select Committee staffs' questioning was to gain more information about the United States sponsored November 1985 weapons shipment to Iran. The questioners were not performing a criminal investigation and never threatened to charge Mr. Clarridge with any crime for having facilitated the weapons delivery. Truthful answers to the questions would not have incriminated Mr. Clarridge, and his allegedly untruthful responses therefore were not exculpatory.

Second. Under the test followed by three Circuits, the "exculpatory no" doctrine applies when the statements are made in an investigative rather than an administrative context, that is, when the questioner is in effect acting as a police officer. *See, e.g., Medina de Perez, supra,* 799 F.2d at 544–45 (government agent acting as "police investigator" is prerequisite to doctrine); *Cogdell, supra,* 844 F.2d at 183 (exception applies to "exculpatory denials made to an officer conducting a criminal investigation"); *United States v. Paternostro,* 311 F.2d 298, 309 (5th Cir.1962) (same). The Tower Commission and the select committees were not law enforcement agencies and their members were not acting as policemen in questioning Clarridge.

Third. The doctrine requires that the false statement not pervert the basic function of the entities to whom the lie was made. It is difficult to imagine on the present record that the allegedly false statements at issue here had any purpose but to impair the essential function of the commission or the committees. The function of the Tower Commission was to:

> conduct[ ] a comprehensive study of the future role and procedures of the National Security Council ("NSC") ... and provide recommendations to the President based upon its analysis of the manner in which the foreign and national security policies established by the President have been implemented by the NSC staff.

Exec. Order No. 12757, 51 Fed.Reg. 43718 (1986).

Through its probe, the Tower Commission was to learn how the NSC operated, trace the flow of information, determine the channels of authority, and piece together the making and implementing of policy. Armed with that information, the Commission was to formulate recommendations concerning the future operations of the NSC to the President. Clarridge was called to aid the Commission in developing an accurate picture of the workings of the NSC. If he did respond untruthfully, as is alleged, the Tower Commission's ability to make meaningful recommendations to the President was seriously impaired.

Similarly, Clarridge's allegedly false statements would impair the primary function of the House Select Committee to Investigate Covert Arms Transactions with Iran. The central mission of the House Committee was to investigate covert arms deals between the United States and Iran. Mr. Clarridge was to testify as to what he knew about that transaction and when he knew it. Any misinformation given to the Committee would impair its ability to understand the dealings between the United States and Iran.

For the reasons stated above, defendant's motion to dismiss Counts V and VII

---

20. At least two Circuits have rejected the doctrine. *See United States v. Barr,* 963 F.2d 641 (3d Cir.1992); *United States v. Steele,* 933 F.2d 1313 (6th Cir.1991).

on the basis of the "exculpatory no" doctrine is denied.

## IX

### Non–Administrative Function of Congress

 Finally, defendant has moved to dismiss Count VII on the ground that section 1001 does not apply to the non-administrative functions of Congress. As defendant concedes, this Court as well as the Court of Appeals have already decided this issue contrary to his position. *United States v. Poindexter*, 725 F.Supp. 13, 24–25 (D.D.C.1989), *rev'd on other grounds*, 951 F.2d 369 (D.C.Cir.1991); *see also, United States v. Bramblett*, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955); *United States v. Clair E. George*, No. 91–0521, 1992 WL 121381 (D.D.C.1992). The Court has considered this issue again, and sees no basis for rejecting its previous decision.[21]

## X

### Conclusion

The effect of the Court's rulings is to reduce the number of charges against Mr. Clarridge from seven to five, by requiring the government to elect between Counts I and II and to go forward on only one of these counts and similarly to elect between Counts VI and VII (Section III, *supra*). With respect to both of these sets of counts it would be unfair to Mr. Clarridge to require him to defend against all four counts since two of them represent merely a reiteration of essentially identical charges. The government shall accordingly decide within twenty days hereof which of the counts it wishes to go forward on, and the other two counts will at that time be dismissed by the Court. The motion to dismiss Counts VI and VII for lack of a proper legislative purpose is held in abeyance with respect to the Count which remains after the government's election. All the other motions are denied.

---

21. Also pending before this Court are three procedural motions requesting additional time to file more motions later. Specifically, Clarridge moves for leave to move at a later date to take depositions, to seek letters rogatory, and to file additional pretrial motions. The Court declines to grant open-ended motions for more time. If and when the defendant wishes to file any one of these substantive motions, he should do so and the Court will consider his request at that time.